**Mary Jane CALLAHAN, Individually and as Administratrix of the Estate of John B. Callahan, Kathleen Ellen Phelps, and Patrick Shawn Callahan, Plaintiffs,**

v.

**THE UNITED STATES of America, et al., Defendants.**

**No. CIV.A.02–123720RCL.**

United States District Court,
D. Massachusetts.

Sept. 28, 2004.

William A. Brown, Boston, MA, A. Douglas Matthews, Fall River, MA, for Robert Fitzpatrick, Defendant.

Katherine A. Carey, Margaret Krawiec, Pater Schlossman, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, Catherine J. Finnegan, U.S. Department of Justice, Washington, DC, for USA, Defendant.

James P. Duggan, Boston, MA, Stephen Neyman, Boston, MA, for Kathleen Ellen Phelps, Mary Jane Callahan, Patrick Shawn Callahan, Plaintiffs.

Edward J. Lonergan, Boston, MA, E. Peter Mullane, Mullane, Michel &

McInnes, Cambridge, MA, for John J. Connolly, Jr., Defendant.

*MEMORANDUM AND ORDER ON THE UNITED STATES' MOTION TO DISMISS*

LINDSAY, District Judge.

## I. INTRODUCTION

This is an action brought by Mary Jane Callahan (the "plaintiff"), individually and as administratrix of the estate of John B. Callahan (the "Estate"), and individual members of the Callahan family against the United States of America and others.[1] The case arises out of the circumstances surrounding the death of John B. Callahan ("Callahan") on or about August 1, 1982. The plaintiff has alleged that one John Martorano, acting at the behest of crime lords James J. Bulger and Stephen J. Flemmi, murdered Callahan. The plaintiff also alleges that, at the time of Callahan's murder, Bulger and Flemmi were "top echelon" informants for the Federal Bureau of Investigation (the "FBI") and leaders of the Boston area's Winter Hill Gang, an association of individuals engaged in criminal activities. The complaint is in ten counts. In count IV and counts VI through IX, the plaintiff asserts claims by the Estate against the United States for wrongful death and emotional distress. The claims against the United States purport to have been brought pursuant to the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346, 2401, 2671, *et seq.* The United States has moved to dismiss all of the claims against it for lack of subject matter jurisdiction, claiming that the plaintiff failed to present her administrative claim to the appropriate federal agency within two years of the accrual of that claim, as required by the FTCA, 28 U.S.C. § 2401(b). The plaintiff presented her administrative complaint on behalf of the Estate on May 14, 2002.

For the reasons stated below, I hold that the plaintiff failed to make a timely presentment of her claim. I therefore GRANT the motion to dismiss.

## II. FACTUAL BACKGROUND

In considering the motion of the United States to dismiss for lack of subject matter jurisdiction, I "accept[ ] the plaintiff's version of jurisdictionally-significant facts as true" and "assess whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction." *Valentin v. Hosp. Bella Vista,* 254 F.3d 358, 363 (1st Cir. 2001). In undertaking this analysis, I must "credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge [to subject matter jurisdiction] accordingly." *Id.*[2]

---

1. Pursuant to my order of February 27, 2003, the claims of Mary Jane Callahan (individually), Kathleen Ellen Phelps, and Patrick Shawn Callahan against the United States were dismissed for lack of subject matter jurisdiction, based on the plaintiffs' failure to present administrative claims. *See* 28 U.S.C. § 2675(a). This order therefore only concerns the claims the plaintiff has asserted on behalf of the Estate against the United States. Accordingly, references to the "plaintiff" in this memorandum are meant as references to the plaintiff only as administratrix of the Estate.

2. *See also Dynamic Image Techs., Inc. v. United States,* 221 F.3d 34, 37 (1st Cir.2000) ("The court, without conversion [of a motion made pursuant to Fed.R.Civ.P. 12(b)(1) to a motion for summary judgment], may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations.")

The First Circuit's shorthand for the method of considering a motion to dismiss for lack of subject matter jurisdiction, without challenging the truthfulness *vel non* of plaintiff's allegations is the "sufficiency challenge." *Va-*

In my disposition of the present motion, I have considered the plaintiff's administrative complaint, *see* U.S. Br. Supp. Mot. Dismiss Ex. 3, her complaint in this lawsuit, and the documents attached to the plaintiff's memorandum in opposition to the government's motion. (*I.e.*, Affidavit of Mary Jane Callahan; Affidavit of Richard Nazzaro; *Florida v. Martarano* [sic], Case No. F01–008287C (Fla.Cir.Ct. Mar. 20, 2001) (Silverman, J.) (transcript of hearing of John Martorano's plea of guilty to Callahan's murder)). I have also considered numerous media reports the government submitted in conjunction with this motion, focusing in particular on an article published on September 12, 1999, in which the plaintiff was quoted as having said, in reference to Callahan's murderer, that she "need[ed] to forgive him." U.S. Br. Supp. Mot. Dismiss Ex. 4 (Andrea Estes, *Outraged Hit Man Turned Rat for Revenge*,

BOSTON HERALD, Sept. 12, 1999, at 1 (the "Estes article"), *available at* 1999 WL 3407747).[3] The plaintiff has not contested the authenticity of these documents, and she admits that the statement in the Estes article was properly attributed to her. M. Callahan Aff. ¶ 31. I have relied also on the publicly available plea agreement between Martorano and the United States Attorney and state prosecutors from Florida, Oklahoma, and Massachusetts. U.S. Reply Br. Ex. 2 (letter from James Farmer to Francis DiMento of 8/24/99 and attachments thereto (the "plea agreement")), and the docket order of United States District Judge Mark L. Wolf denying the request of the United States' to seal the entire plea agreement, U.S. Reply Br. at 1 n. 1 (quoting *United States v. Martorano*, Crim. No. 97–10009–MLW (D.Mass. Sept. 9, 1999) (docket entry 52)).[4] Further, I have drawn on the findings of fact in *Unit-*

*lentín*, 254 F.3d at 363. Other circuits, often referring to this method as a "facial attack," have explicitly stated that, where the court is not engaging in jurisdictional factfinding, the plaintiff's allegations are viewed in the same manner as they would be with respect to a motion made pursuant to Fed.R.Civ.P. 12(b)(6). *See, e.g., Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir.2003); *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1237 (11th Cir.2002); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). While the First Circuit has not explicitly drawn a parallel between a sufficiency challenge to subject matter jurisdiction and a Rule 12(b)(6) motion, it has done the functional equivalent by treating the non-moving party's allegations in motions under Rules 12(b)(1) and 12(b)(6) identically and by considering extrinsic materials in both. *Compare Valentín*, 254 F.3d at 363 *with Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) ("Ordinarily ... any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden [in connection with deciding a motion under Rule 12(b)(6)], unless the proceeding is properly converted into one for summary judgment under Rule 56. However, courts have made narrow exceptions for documents the authen-

ticity of which are not disputed by the parties; for official public records; for documents central to [the] plaintiffs' claim; or for documents sufficiently referred to in the complaint." (citation omitted)).

I could also determine whether the plaintiff's allegations supporting subject matter jurisdiction can withstand a "factual challenge." *Valentín*, 254 F.3d at 363. Under this approach, "the plaintiff's jurisdictional averments are entitled to no presumptive weight," and "the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Id.* In this case, however, I do not need to engage in differential factfinding because the government has treated the plaintiff's allegations as true.

3. Andrea Estes authored other articles concerning Callahan. *See infra* notes 8, 10–11 and 13. In this memorandum, however, the term "Estes article" or the shortened citation "Estes, *supra*" will refer to this September 12, 1999 article.

4. The government has included a portion of this order in its reply brief:

At a 9/9/99 ex parte conference, the gov't submitted to the court the plea agreement

*ed States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999), to which the plaintiff has referred in her complaint, Compl. ¶ 15.

## A. The Murder of Callahan

On August 2, 1982, Callahan's body was found in the trunk of his car at the Miami International Airport. He had been shot to death. Compl. ¶ 1. The complaint alleges that in the years leading to the Callahan murder, the Boston office of the FBI "had maintained an illicit . . . relationship with members of the Winter Hill Gang, specifically Bulger and Flemmi." *Id.* ¶ 12. The Winter Hill Gang was a "clandestine criminal enterprise" that, "through a membership of gang associates, operatives and enforcers," engaged in crimes, including "murder, bribery, extortion, loan sharking, and illegal gambling in the greater Boston area." *Id.* ¶ 110. In the mid–1970's, the FBI "sought out and recruited both Bulger and Flemmi to serve as informants in the Bureau's 'Top Echelon' informant program" as part of the FBI's "dogged pursuit of, and efforts to investigate, penetrate and bring down, the Boston branch of La Cosa Nostra . . ., otherwise known as the mafia." *Id.* ¶¶ 12, 157, 158. The FBI's relationship with Bulger and Flemmi was illicit because the FBI "violated its own rules and regulations" in order to "protect[ ] Bulger and Flemmi from prosecution for their ongoing criminal activities" and to "preserve Bulger and Flemmi's status as Agency informants." *Id.* ¶¶ 13, 17.

For example, FBI Organized Crime Squad agent John Connolly—the "handler" for Bulger and Flemmi-and agent John Morris, Connolly's direct supervisor, "tipped Bulger and Flemmi to the identity of individuals who were providing criminal information against Bulger and Flemmi." *Id.* ¶¶ 29, 113, 118. "As a direct and natural consequence of the disclosures of this . . . information, and as [the FBI] knew or had reason to believe would be the case, these individuals were murdered." *Id.* ¶ 119.

According to the complaint, Callahan's murder was in the pattern of the relationship between the FBI and Bulger and Flemmi, described in the preceding paragraph. In 1981, Callahan learned that "various individuals" had been "skimming profits" from World Jai Alai ("WJA"), a company of which Callahan had been the president and chief executive officer. Callahan reported this criminal activity to others, but his complaints "fell on deaf ears." *Id.* ¶¶ 4, 7, 245.[5] At about the same time, Roger Wheeler, the chairman of WJA, was murdered. *Id.* ¶ 8; Estes, *supra.* Callahan feared a connection between the murder and Wheeler's knowledge of the profit-skimming and voiced these concerns to H. Paul Rico, WJA's head of security and a former FBI agent who had developed Flemmi as an informant in the 1960's. Compl. ¶¶ 5, 8, 77–81.

In January 1982, Brian Halloran, a criminal defendant "facing a state murder

with John Martorano and requested that it be sealed. In view of the legitimate public interest in this matter, and the fact that at least certain aspects of the plea agreement have been disclosed to the media and already published and broadcast, the motion to seal the complete plea agreement is hereby DENIED. U.S. Reply Br. at 1 n. 1. The portion of the plea agreement the court allowed to be sealed contained a list of individuals against whom Martorano had agreed to testify. *United States v. Martorano*, Crim. No. 97–10009–

MLW (D.Mass. Sept. 9, 1999) (docket entry 52); Plea Agreement at 4–5.

5. The complaint does not explicitly state that Callahan himself reported the profit skimming, but it is reasonable to infer that he did from the allegation that "Callahan learned that various individuals with no readily apparent ties to World Jai Alai had in fact been skimming profits. Complaints of this activity fell on deaf ears." Compl. ¶ 7. The complaint does not indicate to whom such reports were made.

charge, began to cooperate with the FBI in Boston." *Id.* ¶ 230. Halloran told agents Leo Brunnick and Gerald Montanari of the FBI's Labor and Racketeering Squad "that he met Bulger and Flemmi at Callahan's apartment and was asked if he [Halloran] was willing to murder Wheeler." *Id.* Halloran reported to the agents that "Bulger and Flemmi along with John Callahan and John Martorano had caused Wheeler to be murdered." *Id.* Brunnick relayed these allegations to Morris to get the latter's "assessment of Halloran's reliability as a potential witness." *Id.* Realizing that "Halloran's allegations threatened future [of Bulger and Flemmi] as FBI informants, . . . Morris told Brunnick that Halloran was untrustworthy and unstable and would not be a believable witness." *Id.* ¶¶ 230, 231. In May 1982, Connolly alerted Bulger and Flemmi that Halloran had implicated them in the Wheeler murder. At about the same time, the FBI denied Halloran's request to be placed in the witness security program. *Id.* ¶¶ 235, 236. Shortly thereafter, Bulger and others murdered Halloran to prevent him from testifying before a federal grand jury investigating Wheeler's murder. *Id.* ¶¶ 237, 238.

"In or about June 1982, Connolly told Bulger and Flemmi that the investigative efforts relating to the murder of Roger Wheeler were being directed toward John B. Callahan . . . ." *Id.* ¶ 245. "Concerned that Callahan might implicate Bulger and Flemmi in the Wheeler murder, and to prevent his cooperating with law enforcement authorities and providing testimony in the Wheeler homicide investigation," Bulger and Flemmi "decided that they would kill Callahan in Florida and make the murder to appear robbery related." *Id.* ¶¶ 224, 246. On or about August 1, 1982, Martorano murdered Callahan at the direction of Bulger and Flemmi. *Id.* ¶¶ 10, 247.

On August 3, 1982, two Miami–Dade Florida police detectives came to the plaintiff's house in Winchester, Massachusetts and informed her of Callahan's death. M. Callahan Aff. ¶ 5. Later in the month, Montanari and other FBI agents interviewed the plaintiff at length on two occasions at her home. *Id.* ¶¶ 6, 7. In the following two years, Montanari visited the plaintiff at her home several times, always arriving unannounced and alone. *Id.* ¶ 8. He asked the plaintiff "the same questions—about money on each visit." *Id.* During one of these visits, Montanari stated that he "believed that this [the murder of Callahan] was not a 'professional hit' because it appeared [Callahan] had been robbed." *Id.* Montanari told the plaintiff "that his theory was confirmed when John B. Callahan's watch was located sometime after [Callahan's] murder [in] Hialeah[, Florida]," and that Callahan "was probably killed by Cuban gangsters with drug affiliations." *Id.*

In the winter of 1984, the plaintiff (or someone acting for her) contacted an attorney, William A. Brown, "to complain about the nature and frequency of the Montanari visits." *Id.* Brown advised the FBI that he should be contacted about future visits the FBI wished to have with the plaintiff. *Id.* In January 1985, Montanari served the plaintiff with a subpoena to appear before a grand jury sitting in Miami; and, in March 1985, the plaintiff, accompanied by Brown, made a trip to Miami. *Id.* ¶¶ 10, 11.[6] With the exception of one conversation with the FBI in the summer of 1987, the plaintiff did not have any contact with the government concerning Callahan's murder between March 1985 and August 1999. *Id.* ¶¶ 12–14. In her interactions with the government from 1982 through 1987 and those over a decade

---

6. Neither the plaintiff's affidavit nor the com- plaint states what the plaintiff did in Miami.

later, the plaintiff "consistently" asked representatives of the government for information about Callahan's death. *Id.* ¶ 29.[7] In response to each inquiry, these representatives told her that the government could not release the information. *Id.*

In the meantime, according to the complaint, the FBI's conduct prevented Callahan's murder from being meaningfully investigated. For example, in 1983 Robert Fitzpatrick, the assistant special agent in charge of the Boston office of the FBI, successfully dodged a request by Oklahoma City FBI agents to interview Bulger and Flemmi; Fitzpatrick prevented the interview by falsely reporting that he had questioned Bulger regarding the Wheeler and Callahan murders, and that Bulger had denied involvement in those murders. Compl. ¶¶ 249, 250. In addition, internal reports of the FBI, containing Halloran's charges against Bulger, Flemmi, and Callahan, were not indexed according to FBI rules, making that information "virtually inaccessible to others who might wish to review or evaluate it." *Id.* ¶¶ 265, 266. The FBI also continued to shield Bulger

and Flemmi from prosecution of any of their crimes by sharing confidential law enforcement information with them, including the identity of informants who might implicate them in criminal activity. *See generally id.* ¶¶ 270–341.

## B. Martorano's Plea Agreement and the *Salemme* Decision

After approximately twelve years of not communicating with law enforcement officers concerning Callahan's death, the plaintiff met with a Detective Nyberg of the Miami–Dade Police Department and Agent Daniel Doherty of the United States Drug Enforcement Agency (the "DEA") at a hotel in Burlington, Massachusetts on August 30, 1999. M. Callahan Aff. ¶¶ 14, 15. Richard A. Nazzaro, a boyhood friend of Callahan, accompanied the plaintiff to lend her support. *Id.*; R. Nazzaro Aff. ¶¶ 1–4. Prior to this meeting, several media reports had discussed Martorano's responsibility for Callahan's death and a possible plea agreement between the government and Martorano. U.S. Br. Supp. Mot. Dismiss Exs. 20–23.[8] These reports stated that Callahan had been in-

---

**7.** In her affidavit, the plaintiff swore that

> [a]t all times mentioned in the previous paragraphs [covering the time from 1982 through 2001] I inquired on many subjects concerning my husband's murder. I consistently asked who killed my husband and why this person killed him. I was consistently told that the government was not at liberty to release this information. These inquiries started in August 1982 and continued until John Martorano plead [sic] guilty to the crime in Florida.

M. Callahan Aff. ¶ 29.

**8.** *See* Andrea Estes & Ralph Ranalli, *Reputed Mobster on Verge of Plea–Bargain Deal*, BOSTON HERALD, May 13, 1999, at 12 ("Martorano has also agreed to provide information on the execution-style murder of John Callahan . . . ."), *available at* 1999 WL 3398191; Howie Carr, *When Martorano Starts Singing, It*

*Should Be a Hit,* BOSTON HERALD, Apr. 2, 1999, at 19 ("One day, Johnny [Martorano] got the call to drive out to Miami International to pick up this fringe guy named Callahan who was skimming the jai alai fronton. Johnny dropped Callahan and his luggage off in the trunk of a rented car."), *available at* 1999 WL 3394352; Ralph Ranalli, *States Close in on Deal to Hear Mobster*, BOSTON HERALD, Feb. 4, 1999, at 5 (discussing a possible plea agreement between Martorano and prosecutors from Miami, Florida and other jurisdictions and stating that Martorano had "long been a suspect" in Callahan's murder), *available at* 1999 WL 3389302; Ralph Ranalli, *Gangster's Mob Testimony Held up by Agency Fighting*, BOSTON HERALD, Nov. 16, 1998, at 18 (stating that negotiations on the plea agreement involved the district attorney for Miami, Florida, and that Martorano had "long been a suspect" in Callahan's murder), *available at* 1998 WL 7361123.

volved in the profit-skimming from World Jai Alai, that Halloran had implicated Callahan in the Wheeler murder, and that Martorano was thought to have killed Callahan. *Id.*

At the August 30, 1999 meeting, which had been initiated by the law enforcement officers, Doherty advised the plaintiff of a "possible plea agreement between the man who they thought killed [Callahan] and the government." M. Callahan Aff. ¶ 16; R. Nazzaro Aff. ¶ 5. Doherty, however, "refused to name the person responsible for the killing" and "refused to inform [the plaintiff] as to the circumstances surrounding [Callahan's] murder or to respond to [her] inquiries regarding the same." M. Callahan Aff. ¶ 16; R. Nazzaro Aff. ¶ 5. When the plaintiff expressed concerns about "false reports the media was printing about her late husband," Nyberg "told [the plaintiff] not to pay attention to media accounts of the incident" and that the media "print[s] anything to sell papers." R. Nazzaro Aff. ¶ 5. Nyberg also informed the plaintiff that, as to the Callahan case, the newspapers "printed only what the government told them to print." M. Callahan Aff. ¶ 30.[9] Nyberg reassured the plaintiff that her husband was not a "gangster." *Id.* The plaintiff, however, "believed none of what [she] was told by the government at this meeting given the fact that nothing said was definitive or certain" and found that the "meeting mirrored meetings [she] had years earlier with Agent Montanari." M. Callahan Aff. ¶ 16.

On September 9, 1999, Judge Wolf ordered that substantial parts of the plea agreement between Martorano and the federal and state prosecutors be made public. *See supra* note 4 and accompanying text. The agreement, signed by Martorano and federal, Florida, Oklahoma, and Massachusetts prosecutors, contained the following condition: "Defendant will also plead guilty in Dade County, Florida to an Information charging defendant with murder in the Second Degree for the murder of John Callahan. Defendant expressly and unequivocally admits that he in fact committed the crimes described above, and is in fact guilty of those offenses." Plea Agreement at 1. In the days following Judge Wolf's order, local newspapers announced Martorano's plea agreement, as well as the fact that the plea agreement was not under seal, and that Bulger and Flemmi allegedly ordered Martorano to kill Callahan to prevent him from disclosing information about the Wheeler murder. U.S. Br. Supp. Mot. Dismiss Ex. 24.[10]

---

**9.** The plaintiff's affidavit is unclear as to when Nyberg made this statement, M. Callahan Aff. ¶ 30, but she only identified one interaction with him—the August 30, 1999 meeting, *id.* ¶ 15. Similarly, Nazzaro stated in his affidavit, that during the August 30, 1999 meeting, Nyberg told the plaintiff not to believe media reports about her husband. R. Nazzaro Aff. ¶ 5.

**10.** *See* Andrea Estes, *Murderous Rats Mobster Mobster Ties Bulger, Flemmi to Murders,* Boston Herald, Sept. 10, 1999, at 1 ("[Bulger and] Flemmi were also ruthless killers, executing at least nine men who got in their way, says hit man-turned-Mob informer John Martorano"; "[Martorano] will also accuse [Bulger and Flemmi] of ordering the murder of John Callahan ...."), *available at* 1999 WL 3407637; Shelley Murphy, *US Attorney Defends Deal with Hit Man,* Boston Globe, Sept. 10, 1999, at A1 (reporting that "as part of a plea agreement unsealed [on September 9, 1999]," Martorano would "plead guilty to the murder of Callahan."), *available at* 1999 WL 6080494; Andrea Estes, *Notorious Mobster Strikes Plea bargain with Feds,* Boston Herald, Sept. 9, 1999, at 1 (reporting that under the plea agreement, Martorano "agreed to detail the execution-style murder of John Callahan," that "[f]or the plea agreement to fly, authorities in Florida ... had to agree not to pursue Martorano for crimes he will confess to," and that "Callahan ... helped Bulger and Flemmi orchestrate Wheeler's murder and had to be killed to prevent him from squealing"), *available at* 1999 WL 3407512; Shelley Murphy, *Ex–Mobster Reportedly Strikes Deal,* Boston

One such newspaper article was the Estes article, which purported to report the plaintiff's reaction to learning that an individual had agreed to plead guilty to Callahan's murder. In discussing the plea agreement, the Estes article explained that Martorano was an "enforcer" for the Winter Hill Gang, who killed upon command "out of loyalty ... for [his] friends." *Id.* Out of the ten murders he committed, "Bulger and Flemmi participated-either ordering or helping carry out nine murders. *During this period they [Bulger and Flemmi] were also FBI informants.*" *Id.* (emphasis added). Having connected the murderers of Wheeler, Callahan and others to the FBI, the Estes article continues, connecting the actual murders to information provided by the FBI, and quoting the plaintiff:

... In perhaps his most sensational murder, Martorano shot Roger Wheeler, the millionaire chairman of World Jai Alai—on orders from Bulger or Flemmi . . . .

Wheeler, who ha[d] just bought the company, had told Connecticut State Police he suspected the Winter Hill gang was skimming profits from jai alai frontons . . . .

He was shot once in the face in 1981 . . . .

*Martorano believes the FBI told Flemmi and Bulger about Wheeler's suspicions. John Callahan, a former president of [WJA], was also killed because he knew too much.*

*As part of his deal with prosecutors, Martorano will plead guilty to the 1982*

*killing of Callahan,* whose body was found in the trunk of a Cadillac at Miami International Airport.

*"As a Christian, I need to forgive the man,"* Callahan's widow Mary, said. "I'm not saying I have forgiven him, I'm saying that I'm working on it."

*Id.* (emphasis added). The plaintiff acknowledges that she made the statement attributed to her in the article, but she has neither explicitly admitted nor denied whether she knew at the time that Martorano had agreed to plead guilty to Callahan's murder:

In September of 1999 I spoke with Boston Herald reporter Andrea Estes. Ms. Estes questioned me concerning my feelings about the possibility that the murderer of my husband might be receiving a short sentence. I responded just as she published in the article referred to by the government in its motion. My husband was a very large man so I assumed that in order to get him into the trunk of a car another man and probably more than one man had committed the killing. Thus, based on the questions asked by Estes, along with the physical size of the [sic] John B. Callahan, I assumed the person responsible was a man.

M. Callahan Aff. ¶ 31. Subsequent articles also publicized the fact that Martorano would plead guilty in a Florida state court to Callahan's murder. U.S. Br. Supp. Mot. Dismiss Ex. 24.[11]

Just a few days after the Estes article was published, Judge Wolf issued the opin-

GLOBE, Sept. 9, 1999, at A1 ("Sources said Martorano has admitted killing Callahan ...."), *available at* 1999 WL 6080256.

**11.** Andrea Estes, *Travel Problems May Delay Hit Man's Court Testimony,* BOSTON HERALD, Sep. 25, 1999, at 9 ("Among Martorano's admitted victims were ... John Callahan ...."), *available at* 1999 WL 3408728; *Plea*

*Bargain with Hit Man Not a Done Deal,* PATRIOT LEDGER, Sept. 20, 1999, at 7 (reporting that under the plea agreement, Martorano had "offered to confess to killing John Callahan"), *available at* 1999 WL 8473748; Andrea Estes, *Deal's Not Done,* BOSTON HERALD, Sept. 18, 1999, at 1 (same), *available at* 1999 WL 3408158.

ion *United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass. Sept.15, 1999), which contained a landmark narration of a corrupt relationship among FBI agents in Boston and Bulger and Flemmi. The overriding theme of Judge Wolf's findings was that the FBI had repeatedly protected Bulger and Flemmi from investigation and prosecution, and, in so doing, had tacitly given Bulger and Flemmi a license to commit murder and other crimes to protect themselves and to further their criminal enterprise. More specifically, Judge Wolf found, *inter alia*, that Wheeler had suspected that Callahan was skimming profits from WJA, and that Halloran had told the FBI that, during a meeting at Callahan's apartment, Bulger and Flemmi asked Halloran if he were willing to murder Wheeler. *Id.* at 208–09. The court also found that the Oklahoma City office of the FBI wanted to explore the relationship between Callahan and Halloran as part of its investigation of the Wheeler murder. *Id.* at 209. The Boston office of the FBI opened up an investigation into the Wheeler murder to support the investigation by the Oklahoma City office. *Id.* As part of that investigation, Connolly interviewed Callahan at Morris's request; the Boston investigation was quickly closed thereafter. *Id.*

The court also found that FBI agent Montanari, who had visited the plaintiff in the 1980's after Callahan's death, had been privy to information potentially relevant to Callahan's murder. In 1982, Montanari was assigned to work with Halloran and found out about Halloran's allegations concerning his meeting with Bulger and Flemmi at Callahan's apartment. *Id.* Montanari also interviewed Bulger and Flemmi about their possible involvement in the Wheeler and Callahan murders. *Id.* at 212. During this interview, "Bulger and Flemmi denied any involvement in the Wheeler and Callahan murders," but "[t]hey refused ... to take a polygraph examination." *Id.*[12]

Pursuant to the plea agreement, on September 30, 1999, Martorano admitted in federal district court that he had murdered ten persons. News articles published the next day, October 1, 1999, reported the plea in federal court as well as the fact that Martorano would plead guilty to murder in state courts of Florida and Oklahoma. *See* U.S. Br. Supp. Mot. Dismiss Ex. 25.[13]

---

**12.** In *Salemme*, the court ultimately found:

As a result of the delayed disclosure of the Halloran documents by the government and of the failure of the adversary system to operate fully and effectively on this issue, questions remain regarding the role, if any, played by Flemmi and Bulger in the Wheeler, Halloran, and Callahan murders, and the full degree to which the FBI in Boston has, from 1981 until recently, attempted to keep any such role from being discerned and demonstrated.

91 F.Supp.2d at 213. The plaintiff noted this finding in her complaint, Compl. ¶ 226 ("In September of 1999, Judge Wolfe [sic] concluded in [*Salemme*] that the murder of John Callahan remained unsolved."), and also argued that "the government fails to account for Judge Wolfe's [sic] finding in [*Salemme*] that the murder of John Callahan remained unsolved," Pl.'s Opp. U.S. Mot. Dismiss at 16. However, Judge Wolf's statement in *Salemme* does not define what the plaintiff knew or should have known at that time. By necessity, Judge Wolf's finding was based on proffered evidence, rather than on all publicly available information. In fact, Judge Wolf noted:

The record from which the facts described in detail in this Memorandum have been found includes many documents and the testimony of many witnesses.... [N]o party called John Martorano to testify. However, within the past week, on September 9, 1999, the government filed a plea agreement with John Martorano which provides for his cooperation in future proceedings.

*Salemme*, 91 F.Supp.2d at 174 n. 23.

**13.** *See* Andrea Estes, *Hitman Cops to Killings in Squeal Deal*, BOSTON HERALD, Oct. 1, 1999, at 4 ("If the deal is accepted, Martorano ... will also be charged and given concurrent sentences for the 1981 murder of World Jai

Despite the media attention given to Martorano's agreement to plead guilty to Callahan's murder and the *Salemme* decision, Doherty would not provide the plaintiff with information regarding Callahan's murder. Between August 30, 1999 and May 12, 2000, the plaintiff asked Doherty on two or three occasions about Callahan's murder, but Doherty again refused to provide any information. M. Callahan Aff. ¶ 16. At Doherty's request, the plaintiff (accompanied by Nazzaro) met with him and Massachusetts State Police Sergeant Stephen Johnson on May 12, 2000. *Id.* ¶¶ 18–20. During this meeting, "there was no mention of the facts surrounding the murder nor was the name John Martorano mentioned." *Id.* ¶ 22; R. Nazzaro Aff. ¶ 7. Despite the plaintiff's requests, Doherty and Johnson "refused to identify the person who killed [Callahan]" and "refused to inform [the plaintiff] as to the circumstances surrounding the murder or to respond to [the plaintiff's] inquiries as to the same." M. Callahan Aff. ¶ 22; R. Nazzaro Aff. ¶ 7. When the plaintiff also asked "whether certain newspaper accounts involving [Callahan's] murder and John Martarano [sic] were true," Doherty and Johnson replied that the plaintiff "should not rely on newspaper accounts;" that "the reports were inaccurate;" and that "only the government and the person who killed John B. Callahan had actual knowledge of

the events surrounding his murder." R. Nazzaro Aff. ¶ 8.[14]

Between May 12, 2000 and April 2001 the plaintiff had various interactions with Doherty, Johnson, and Assistant United States Attorney Fred M. Wyshak, Jr., including testifying about Callahan's financial interests before a federal grand jury investigating matters within Wyshak's prosecutorial portfolio. M. Callahan Aff. ¶¶ 23–26. The plaintiff also had a meeting with a Special Agent O'Rourke[15] in January 2001, during which O'Rourke "discussed only John B. Callahan's financial situation, his job in Florida and gambling in general." *Id.* ¶ 27. As with the plaintiff's other contacts with the government, on these occasions, the plaintiff "inquired on many subjects concerning [Callahan's] murder" and was "consistently told that the government was not at liberty to release this information." *Id.* ¶ 29. The government also "consistently" told the plaintiff that she "should not rely on newspaper accounts" because the reports were "inaccurate." *Id.* ¶ 30.

## C. Martorano's Plea of Guilty to Callahan's Murder

On or about March 20, 2001, Martorano pleaded guilty in the Eleventh Judicial Circuit in Dade County, Florida to murdering Callahan. *Florida v. Martarano* [sic], Case No. F01–008287C (Fla.Cir.Ct.

---

Alai chairman Roger Wheeler in Oklahoma and the 1982 murder of World Jai Alai official John Callahan in Florida."), *available at* 1999 WL 3409903; Leslie Miller, *Mobster Admits 10 Killings*, PATRIOT LEDGER, Oct. 1, 1999, at 6 ("Martorano also offered to confess to the 1982 killing of John Callahan .... He is expected to plead guilty to [the Callahan and Wheeler] killings in state courts in Florida and Oklahoma."), *available at* 1999 WL 8474984.

**14.** There is a possible inconsistency between statements by the plaintiff and Nazzaro that

Martorano's name was not "mentioned" during the May 12, 2000 meeting and Nazzaro's representation that the plaintiff specifically asked Doherty and Johnson about Martorano. *Compare* M. Callahan Aff. ¶ 22 *and* R. Nazzaro Aff. ¶ 7 *with* R. Nazzaro Aff. ¶ 8. I interpret these statements as alleging that Doherty and Johnson did not "mention" Martorano's name until the plaintiff raised the issue.

**15.** The plaintiff did not indicate the agency O'Rourke represented.

Mar. 20, 2001) (Silverman, J.). At the colloquy, the court asked whether the victims had any position with respect to the plea agreement, and an assistant state attorney responded, "We have been in contact with Ms. Callahan and she's in full agreement." *Id.* at 6. Another assistant state attorney explained why Martorano murdered Callahan: "Mr. Callahan had been murdered after the meeting between him and Mr. Martarano [sic], because information previous to August the 2nd of '82[,] Mr. Callahan had known of the murder of Roger Wheeler in Tulsa, Oklahoma." *Id.* at 16. The transcript of Martorano's change of plea hearing does not contain any mention of Bulger, Flemmi, Morris, or Connolly. The plaintiff later learned that Martorano had actually pleaded guilty to Callahan's murder "through newspaper articles only." M. Callahan Aff. ¶ 28.

On or about May 14, 2002, the plaintiff presented an administrative claim to the FBI, Compl. ¶ 50, in which she alleged that

> [i]n April of 2001, one John Martorano admitted to killing Callahan. Claimant *then learned* that Martorano was hired to kill her husband on behalf of James "Whitey" Bulger and Steven Flemmi, informants for the [FBI]. Bulger and Flemmi learned that the victim had information that they were "skimming" profits from World Jai Alai in Miami. Bulger and Flemmi learned this from H. Paul Rico .... The information was passed from Rico to FBI agents Morris and Connolly who in turn alerted Bulger and Flemmi.

U.S. Br. Supp. Mot. Dismiss Ex. 3; Compl. ¶ 50 (emphasis added). The United States did not dispose of the plaintiff's adminis-

trative claim within six months of the presentment, and the plaintiff elected to treat the claim as having been "finally denied," pursuant to 28 U.S.C. § 2675. Compl. ¶ 51. The plaintiff filed this lawsuit on or about December 10, 2002, alleging, *inter alia*, that "[i]t became known, in March, 2001, that the gunman [who murdered Callahan] was John V. Martorano .... He did this on orders from ... Bulger and ... Flemmi ...." Compl. ¶ 10.

### III. DISCUSSION

### A. Accrual of Claims under the FTCA

 The motion of the United States raises the question of when the plaintiff's claim accrued. "The general rule, within the meaning of the FTCA, is that a tort claim accrues at the time of the plaintiff's injury." *Skwira v. United States,* 344 F.3d 64, 73 (1st Cir.2003) (quoting *Attallah v. United States,* 955 F.2d 776, 779 (1st Cir.1992)), *cert. denied,* —— U.S. ——, 124 S.Ct. 2836, 159 L.Ed.2d 267 (2004). Under the so-called discovery rule, however, "the test [of accrual] is whether plaintiff knows, or in the exercise of reasonable diligence should have known, the factual basis of the cause of action, including the fact of the injury and the injury's causal connection to the government." *Cascone v. United States,* 370 F.3d 95, 104 (1st Cir.2004).[16]

While the parties are undoubtedly familiar with the general requirements and contours of the discovery rule, a few observations about the rule are particularly relevant to this case. As the term "reasonable person" indicates, the standard is an objective one, *id.,* and a plaintiff's irrational disbeliefs or conclusions will not delay accrual of the claim. Similarly, because "there is, of course, a reasonable

---

**16.** After the parties in this case briefed the statute of limitations issue, the First Circuit dispelled any remaining doubt that the discovery rule applies to all FTCA claims-not just those for medical malpractice. *See Cascone,* 370 F.3d at 104; *McIntyre v. United States,* 367 F.3d 38, 52 (1st Cir.2004); *Skwira,* 344 F.3d at 74–75.

diligence component to this knowledge requirement," a plaintiff may not preserve her claim by "bury[ing] her head in the sand." *Skwira*, 344 F.3d at 77 (quoting *Diaz v. United States*, 165 F.3d 1337, 1339 (11th Cir.1999)). If a plaintiff is not reasonably diligent in investigating the cause of her injury, "the law will impute to her an awareness of any knowledge that she would have uncovered if she had undertaken that inquiry." *Id.* Indeed, a plaintiff's "duty of investigation under the discovery rule is not a negligible one." *Marrapese v. Rhode Island*, 749 F.2d 934, 943 (1st Cir.1984).

Second, although the cognizance required to trigger accrual is often referred to as "knowledge," *Skwira*, 344 F.3d at 77, the term is far from definitive and suggests a host of epistemological possibilities. All the same, the First Circuit has clearly stated that something less than absolute certainty starts the limitations clock:

> [T]he knowledge which triggers accrual (and hence the running of the statute of limitations) is the discovery of sufficient facts about the injury and its cause to prompt a reasonable person to inquire and seek advice preliminary to deciding if there is a basis for filing an administrative claim against the government.... The degree of knowledge of injury and cause that would prompt a reasonable person to take these protective steps will vary with the circumstances of the case, but, in any event, *conclusive knowledge is not necessary.*

*Id.* at 78 (emphasis added). Thus, the degree of knowledge necessary for accrual is cast in terms of probability and likelihood rather than positivity and certitude. Descriptions of the requisite knowledge include "sufficient facts to permit a reasonable person *to believe* that there is a causal connection between the government and her injury," *id.* (emphasis added); *"aware[ness]* of [an] injury and its *proba-*

*ble* cause," *id.* (first emphasis in added) (quoting *United States v. Kubrick*, 444 U.S. 111, 118, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)); being "informed" that it was *"highly possible"* a known injury resulted from particular medical treatment, *id.* (quoting *Kubrick*, 444 U.S. at 114, 100 S.Ct. 352); *"notice* of the injury and its *potential* cause," *id.* (first emphasis added) (quoting *Gonzalez v. United States*, 284 F.3d 281, 291 n. 10 (1st Cir.2002)); " 'hav[ing] *reason to believe* ' that the government was responsible for the injury," *id.* (emphasis added) (quoting *Garza v. United States Bureau of Prisons*, 284 F.3d 930, 935 (8th Cir.2002)); and "hav[ing] *some indication* that there *may have been* a government cause of the injury," *id.* (quoting *Diaz*, 165 F.3d at 1340) (emphasis added).

Finally, while the required "knowledge" that triggers accrual may not provide an adequate basis for an immediate lawsuit, it must be sufficient to "arm[ ]" the plaintiff "with the facts about the harm done to [her]" such that she "can protect [her]self by seeking advice in the ... legal community." *Kubrick*, 444 U.S. at 123, 100 S.Ct. 352. Once the claim accrues, the plaintiff then has two years to present her administrative claim:

> To excuse [her] from promptly [seeking legal advice] by postponing the accrual of [her] claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government.... If advised that [she] has been wronged, [she] may promptly bring suit. If competently advised to the contrary, [she] may be dissuaded, as [she] should be, from pressing a baseless claim.

*Id.* at 123–24, 100 S.Ct. 352 (footnote omitted). Moreover, a plaintiff's failure to seek legal advice or the receipt of poor legal

advice does not toll the running of the period of limitations:

> Of course, [she] may be incompetently advised .... But however or even whether [she] is advised, the putative ... plaintiff must determine within the period of limitations .whether to sue or not, which is precisely the judgment that other tort claimants must make. If [she] fails to bring suit because [she] is incompetently or mistakenly told that [she] does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or [herself] determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury.

*Id.* at 124, 100 S.Ct. 352.[17]

### B. The Accrual of the Plaintiff's Claim Against the United States

Because the plaintiff presented her administrative claim on May 14, 2002, the question raised by the present motion is whether her claim accrued before May 14, 2000. The government maintains that the "plaintiff's claim accrued at the latest in September 1999, after Executrix [sic] Mary Callahan was quoted in the newspaper commenting on the Martorano plea deal, which as the report detailed, implicated former FBI informants Bulger and Flemmi. This article was published after 34 pertinent reports had circulated in local newspapers." U.S. Br. Supp. Mot. Dismiss at 25–26. In contrast, the plaintiff argues that it "strains credulity to understand just how [she] could have detected the factual basis for this action prior to April 2001."[18] Pl.'s Opp. U.S. Mot. Dismiss at 8. According to the plaintiff, she "did not know, nor, given the circumstances of this case, in the exercise of reasonable diligence could have known of the government's responsibility for the death of her husband until the time John Martorano pleaded guilty [in March 2001] to the murder of John B. Callahan." *Id.* at 7.

The plaintiff divides the time between the murder of her husband and the March 2001 guilty plea of Martorano into two periods, for the purpose of explaining why she was allegedly unable to discover her claim before Martorano's March 2001 plea. She argues that, from 1982 until August 1999, her claim could not have accrued because presumably not even the United States government knew who killed her husband. The plaintiff alleges that she neither "kn[e]w nor could she have known who killed her husband prior to the government actually knowing this information itself." *Id.* at 12. She compares her case to *Attallah v. United States,* in which the plaintiff brought an FTCA claim for the loss he suffered when two United States customs agents robbed and killed his courier in 1982. The First Circuit held that the plaintiff could not have known the factual basis of his cause of action until the

---

17. *See also Skwira,* 344 F.3d at 82 n. 18 (holding that the plaintiffs' administrative claims were not timely presented and noting that "[t]he fact that the [decedent's] family decided to place their trust in the U.S. Attorney's Office, electing not to seek competent legal advice until much later, does not alter that conclusion"); *Gonzalez,* 284 F.3d at 289 ("[T]he limitations period begins to run regardless of whether plaintiffs make inquiries, and regardless of whether they are correctly advised.").

18. Because the plaintiff ties accrual of her claim to Martorano's March 2001 plea in a Florida state court to the murder of Callahan and others, it is unclear whether the plaintiff's reference to April 2001, as the earliest time at which her claim could have accrued, is a mistake. For purposes of consistency, I will refer to both the time of Martorano's plea of guilty to Callahan's murder and the accrual date advocated by the plaintiff as March 2001.

government indicted the customs officers five years later: "The police did not have sufficient information to bring charges against the responsible Customs agents until 1987. We believe appellants could not have been more efficient." 955 F.2d at 780. The plaintiff argues that, like the plaintiff in *Attallah*, "at least until the government knew who committed this murder, Mary Callahan did not know, nor could she have known of the government's criminal acts." Pl.'s Opp. U.S. Mot. Dismiss at 10. The plaintiff also implies that Montanari's statement that Callahan's death was not a "professional hit" also suggested that the government was not involved. *Id.* at 12.

The plaintiff contends that during the second period, from August 1999 to until Martorano's plea to the Callahan murder, her claim could not have accrued because the government fraudulently concealed the circumstances of Callahan's death and the identity of his murderer:

> From August of 1999 until the time John Martorano pleaded guilty Mary Jane Callahan sought the identity of her husband's killer and the reason for this crime. She asked if the newspaper accounts were true. The government steered her away from the truth and deliberately mislead [sic] her into disbelieving the published accounts of her husband's murder.

*Id.* at 22–23; *see also id.* at 21–22 ("Mary Jane Callahan did not know the facts or circumstances surrounding the murder of her husband until after John Martorano pleaded guilty. The Wolfe [sic] opinion left unresolved the issue of the Callahan murder as did the government during its meetings with Ms. Callahan. The representations of government officials, purport-ed[ly] possessing inside information about the murder, improperly steered Mary Jane Callahan away from the truth.").[19] Although "[t]he government still has not acknowledged responsibility for the murder of John B. Callahan" *id.* at 22, the plaintiff was able to discover "the truth" about her husband's murder when Martorano pleaded guilty in March 2001 to Callahan's death, *see id.* ("[T]he truth was never disclosed until such time as the murderer pleaded guilty"); *id.* at 12 ("[T]he plaintiff cannot be accountable for knowing or having reason to know the truth prior to Martorano's change of plea."); *cf.* Compl. ¶ 10 ("It became known, in March, 2001, that the gunman [who murdered Callahan] was John V. Martorano .... He did this on orders from ... Bulger and ... Flemmi ....").

■ Although the plaintiff insists that the "the truth" was disclosed at Martorano's March 2001 guilty plea, she has not specified the facts of which that truth consisted. Moreover, other than the transcript of the plea hearing, she has not provided any documents indicating what information she acquired because of the plea. I am thus compelled to assume that the transcript of the change of plea hearing contains all the facts to which the plaintiff refers to when she uses the term "the truth." According to the transcript, the lead prosecutor presented a very brief factual basis for Martorano's plea, essentially stating only that Martorano killed Callahan because Callahan allegedly possessed information about the Wheeler murder. Martorano pleaded guilty to the murder, but did not offer any further details concerning the crime. The transcript neither mentions Bulger or Flemmi nor refers to any government actor as being

---

19. *See also id.* at 10 n. 3 ("[T]his date of August of 1999 marks the first in a series of overt acts committed by the government relative to the fraudulent concealment of the claim. The pattern continued until [March] 2001 when John Martorano pleaded guilty to committing the murder of John B. Callahan.").

involved in Callahan's death. Although the plaintiff has not explained how "the truth" presented during Martorano's March 2001 plea hearing allowed her to understand her "injury's causal connection to the government," *Cascone*, 370 F.3d at 104, I take the plaintiff's position to be an admission that knowledge of the motive behind Callahan's death and the identity of his killer provided the plaintiff with adequate notice that the government was involved in Callahan's murder.[20] Thus, I conclude that the plaintiff's claim accrued when she knew, or in the exercise of reasonable diligence, should have known that Martorano killed her husband and why he did so.

I will assume, *arguendo*, that the plaintiff is correct in arguing that she could not have learned the factual basis of her claim until the government knew of the circumstances of Callahan's death and the identity of his murderer. I will also credit the plaintiff's allegations that, beginning in August 1999, the government agents with whom she spoke had that information, but refused to provide it to her and encouraged her not to believe media reports on the subject. The key question is whether, despite the government's alleged failure to provide "the truth" to the plaintiff, the reasonable person in the plaintiff's position would have otherwise acquired this information by May 14, 2000—two years before the plaintiff filed her administrative claim.

Even taking into account the government's alleged misrepresentations to the

---

**20.** *Compare with McIntyre v. United States*, 254 F.Supp.2d 183 (D.Mass.2003), *rev'd*, 367 F.3d.38 (1st Cir.2004). In *McIntyre*, the plaintiffs sought compensation from the United States for the murder of John McIntyre, an informant for the DEA whom Bulger and Flemmi allegedly killed after the FBI purposefully divulged McIntyre's informant status to them. In opposing the government's motion to dismiss for failure timely to file an administrative claim, the plaintiffs argued that more than two years prior to presentment of the administrative claims, they had lacked "actual knowledge of facts critical to their claim in this case, namely that the United States failed adequately to supervise Connolly who leaked to Bulger and Flemmi that McIntyre was co-operating with law enforcement officials." 254 F.Supp.2d at 189. I disagreed, holding that the plaintiffs "were aware, or in the exercise of reasonable diligence should have been aware, of ample facts for a claim, under the plaintiffs' present theory" prior to the time they obtained such detailed information. *Id.* at 192.

The First Circuit reversed, agreeing with the plaintiffs that more than two years prior to presentment of their administrative claim, there was insufficient information from which the plaintiffs could infer that (1) "McIntyre was murdered because Bulger and Flemmi learned he was informing on them to government authorities"; and (2) "[i]t was agents of the FBI, Connolly and/or Morris, who told Bulger and Flemmi that McIntyre was cooperating with the FBI." *McIntyre v. United States*, 367 F.3d at 59.

Unlike the *McIntyre* plaintiffs, the plaintiff here has not argued that, more than two years before presentment of her administrative claim, she lacked any knowledge relevant to the accrual of her claim except for the identity of her husband's murderer and the reason for which her husband was murdered. Thus, the First Circuit's analysis in *McIntyre* of the information sufficient to provide the *McIntyre* plaintiffs with actual or constructive knowledge of their claim is inapplicable to the plaintiff's argument, because she has framed the relevant question differently from the way it was framed by the *McIntyre* plaintiffs.

Moreover, the Estes article, for which the plaintiff was interviewed, reported that Bulger and Flemmi were FBI informants, and that Martorano believed that the FBI told Flemmi and Bulger about Wheeler's suspicions about the two alleged mobsters' skimming of profits from WJA. That same article noted that Callahan was killed because "he knew too much" presumably about profit-skimming at WJA and the plan to kill Wheeler. There was thus public information available by September 12, 1999, that the FBI had set in motion the train of events that resulted in Callahan's murder.

plaintiff, I hold that it was objectively unreasonable for the plaintiff not to have discovered by October 1, 1999, at the latest, that Martorano killed Callahan because Callahan allegedly possessed information concerning profit-skimming at WJA and the Wheeler murder.[21] There were several junctures at which the plaintiff had adequate notice of this information. For instance, prior to the August 30, 1999 meeting with Doherty and Nyberg, the plaintiff had read some newspaper articles about her husband's death that concerned her. The plaintiff has not indicated the precise content of these articles, but she knew that the press was, at that time, a potential source of information about her husband's murder. At the August 30, 1999 meeting, the plaintiff was informed by two law enforcement agents—one federal and the other state—that the government might enter into a plea agreement with the man they thought killed Callahan, but the agents refused to identify the defendant and encouraged the plaintiff not to believe the newspaper articles about her husband. The plaintiff admits she did not believe anything she was told in that meeting—an understandable skepticism that would have prompted a reasonable plaintiff to search for answers in past or future media reports. The reasonably diligent plaintiff then would have learned from media reports published in the BOSTON HERALD or BOSTON GLOBE on September 9 or 10, 1999 that, pursuant to a publicly available document, Martorano had agreed with the United States Attorney and state prosecutors in Florida, Massachusetts, and Oklahoma to plead guilty to murdering Callahan and many others. From those reports, she also would have learned that Bulger and Flemmi allegedly ordered Martorano to kill Callahan because they feared Callahan would incriminate them in the Wheeler murder. Even if, in light of the government's instructions not to believe media reports, the reasonably diligent plaintiff would have had some doubts about what she read in the papers concerning her husband, she would have sought to confirm the veracity or falsity of these startling reports. She would have done so not by merely communicating with Doherty and Nyberg, who seemed loathe to give her any information, but by also contacting the authors of the articles, the relevant prosecutors, the clerk of the court, or, as she had done in 1984, when she was wary of the FBI's conduct, by hiring an attorney. Any of these actions would have put the reasonable plaintiff in position to learn that Martorano had agreed in writing to plea guilty to Callahan's murder and the reason for the murder.

21. From reading the Estes article, one might reasonably conclude that when the plaintiff was interviewed for the article, sometime prior to September 12, 1999, she knew that reports indicated that Martorano would plead guilty to Callahan's murder. The plaintiff has not explicitly refuted this logical conclusion, and the carefully-worded assertions in her affidavit do not exclude that she did in fact know about the plea agreement when she spoke with Estes. A finder of fact might conclude that the plaintiff's failure explicitly to state her ignorance of information she has identified as crucial to the accrual of her claim is tantamount to an admission of knowledge of that information. However, because I am not engaging in jurisdictional fact-finding, I must "credit the plaintiff's well-pleaded factual allegations" and "draw all reasonable inferences from them in her favor." *Valentín*, 254 F.3d at 363. The inferences to be drawn from the plaintiff's affidavit are that when she spoke with Estes, the plaintiff did not know that Martorano had agreed to plead guilty to Callahan's murder, and that she was not referring to a specific person when she said, "I need to forgive the man." These inferences push hard at the limits of credibility, but, for the present purposes, that is of no concern, because my role, as I have said, does not require differential factfinding.

Even less effort by the plaintiff would have been required to discover from Estes that Martorano would plead guilty to Callahan's murder, and that Martorano had allegedly killed Callahan to prevent him from answering questions of law enforcement agencies about the Wheeler murder and the reason for that murder. As I have noted earlier, Estes contacted and interviewed the plaintiff as part of her research for the Estes article appearing in the BOSTON HERALD on September 12, 1999. The plaintiff implies in her affidavit that when she spoke with Estes, the reporter did not mention the fact that Martorano had allegedly agreed to plead guilty to Callahan's murder. Even if this were the case, and even if the plaintiff were not otherwise aware of Martorano's agreement to plead, it was objectionably unreasonable for the plaintiff to choose to remain in that state of ignorance when she spoke with Estes. At the time of the interview, the plaintiff was aware that reports concerning her husband's murder had recently been in local newspapers; she also had first-hand knowledge that the government might enter into a plea agreement with her husband's murderer, but would not disclose the name of that person to the plaintiff. Under the circumstances, the plaintiff was burying her head in the sand at an incredible depth if she did not ask Estes some very obvious questions about the facts surrounding Callahan's death and the government's alleged plea agreement with his killer.

Moreover, the reasonably diligent plaintiff would have read the Estes article for which she had been interviewed. Upon reading the Estes article, the plaintiff would have learned that, as part of his plea agreement with the United States, Martorano had agreed to plead guilty to Callahan's murder. She also would have learned that Bulger and Flemmi were FBI informants; that FBI agents had informed Bulger and Flemmi that Wheeler had suspicions about profit-skimming from WJA; that he was killed because of his suspicions; and that Callahan was killed because he knew too much about profit-skimming at WJA and the Wheeler murder.[22] Estes, *supra*. Even in the hard-to-imagine case that the plaintiff's failure to question Estes about Callahan's murder during the interview had been reasonable, her subsequent failure to seek information from Estes after reading the article or to perform some other investigation, apart from talking to government agents who contacted her, shows a remarkable lack of diligence.

A reasonably diligent person in the plaintiff's position would also have looked to the *Salemme* opinion for information regarding Callahan's death. The corruption revealed in *Salemme* should have augmented the plaintiff's mistrust in government law enforcement, especially in light of the fact that *Salemme* alerted the plaintiff that Montanari had known of Halloran's allegations concerning Callahan when he spoke with the plaintiff in the 1980's. The reasonably diligent plaintiff also would have learned from the *Salemme* opinion that Callahan allegedly had been involved in the Wheeler murder, and that the FBI had even questioned him about that crime. The *Salemme* opinion also identifies Martorano as an associate of Bulger and Flemmi and a suspect in the Wheeler murder. A reasonably diligent plaintiff, who knew of the plea agreement and had searched the *Salemme* opinion for further information would also have known, with a degree of certainty beyond

---

**22.** Indeed, the Estes article contained all the information pertinent to the plaintiff's knowledge of FBI involvement in Callahan's murder that ultimately appeared in her administrative claim. *See supra* p. 359.

that required by the discovery rule, the circumstances of Callahan's death. Moreover, a reasonably diligent plaintiff would continue, after the *Salemme* decision, to stay abreast of developments in a case regarding her husband's alleged murderer. By October 1, 1999, she would have learned that, pursuant to the plea agreement, Martorano admitted in this court, on September 30, 1999, that he had murdered ten persons. News articles on this event also reiterated that Martorano would plead guilty to murder in state courts of Florida and Oklahoma.

Of course, the plaintiff argues that, at no time before March 2001, could she have known with the requisite degree of certainty that Martorano killed Callahan because DEA and state authorities refused to provide her with the information she requested and instructed her not to believe media reports. This alleged disinformation by government agents did not, however, mitigate the plaintiff's duty to seek information from sources other than the few officials who stonewalled her, *see, e.g., Skwira*, 344 F.3d at 82 n. 18, particularly given the fact that the plaintiff admits she did not trust the government.[23]

Because the plaintiff has equated knowledge of Martorano's culpability and the reason he killed Callahan with knowledge of the causal connection between Callahan's death and the FBI's alleged misconduct, and because the Estes article connected the FBI to the murder, I hold that the plaintiff's claim accrued not later than October 1, 1999, shortly after Martorano admitted to ten murders in a plea given in this court.[24] By that time, (1) there had been newspaper reports of Martorano's plea agreement with federal and state prosecutors, including the fact that the agreement required Martorano to plead guilty to Callahan's murder, and that Bulger and Flemmi had ordered the murder because Callahan allegedly knew of their involvement in the Wheeler murder; (2) the Estes article had reported that Bulger and Flemmi, both FBI informants, had derived from the FBI their knowledge about Wheeler's suspicions about profit-skimming from WJA; (3) Estes had interviewed the plaintiff and quoted her in the BOSTON HERALD; and (4) Martorano had entered his plea of guilty before Judge Wolf, pursuant to the plea agreement, and that fact had been publicized. With actual or constructive knowledge of this wealth of information, the plaintiff's position was

---

**23.** The plaintiff has not alleged that the government's responses to her questions between 1982 and 1987 were so reassuring, certain, or credible that she was reasonably satisfied with similar responses over fifteen years later, at a time when other pipelines of information, such as the Estes article, painted quite a different picture. On the contrary, the plaintiff admits that, at the August 30, 1999 meeting (her contact with authorities having been renewed at the *government's* initiative) she "believed none of what I was told by the government ... given that nothing said was definitive or certain". M. Callahan Aff. ¶ 16 (emphasis added). Thus, when the plaintiff read the Estes article the next month, she should not have been blinded to information revealing the identity of her husband's killer and the alleged connection of the FBI

to that murder. Even if the government's conduct caused the plaintiff to harbor doubts about reports of the plea agreement, the news that Martorano would plead guilty to Callahan's death would have caused the reasonably diligent plaintiff to seek advice about a possible claim against the United States.

**24.** The government's argument that the plaintiff knew or should have known the factual basis of her cause of action on or about September 12, 1999, is persuasive, and this memorandum and order does not exclude the possibility that the plaintiff's claim accrued at that time. I have included events occurring through October 1, 1999 in my analysis of accrual merely to illustrate the abundance of relevant information available to the plaintiff long before Martorano's March 2001 plea.

more advantageous than that of the plaintiff in *Attallah,* who argued that his claim could not have accrued before the government actors responsible for his injury were indicted. *See Attallah,* 955 F.2d at 780. By October 1, 1999, a reasonably diligent person in the plaintiff's position—especially one admittedly exposed to recent newspaper accounts regarding Martorano and Callahan's murder—would have known that it was "probable" or "highly possible," *Skwira,* 344 F.3d at 78, that Martorano committed the crime; that he did so because Callahan allegedly knew that Bulger and Flemmi were responsible for Wheeler's murder; and that Bulger and Flemmi allegedly received from FBI agents information that led them to decide to have Wheeler, and ultimately Callahan, killed.

## C. Fraudulent Concealment

### 1. The Doctrine of Fraudulent Concealment

The plaintiff argues that the government's alleged fraudulent concealment of the Estate's cause of action tolled the limitations period until March 2001. Under federal law, where a claim has already accrued, the running of the limitations period may be tolled if the defendant fraudulently conceals information the plaintiff needs to initiate a lawsuit, *see Salois v. Dime Sav. Bank of New York, FSB,* 128 F.3d 20, 25 (1st Cir.1997) (where plaintiffs admitted their claims accrued outside the period of limitations, viability of plaintiffs' claims depended on whether principles of equitable tolling or fraudulent concealment applied), or to present an administrative claim against the government, *see Gonzalez,* 284 F.3d at 292; *Gonzalez–Bernal v.*

United States, 907 F.2d 246, 250 (1st Cir. 1990). Not all government conduct that frustrates a plaintiff in her investigation of facts material to her claim, however, constitutes "fraudulent concealment": the conduct "must consist of affirmative acts or representations which are calculated to, *and in fact do, prevent the discovery of the cause of action." Gonzalez–Bernal,* 907 F.2d at 250 (emphasis added) (quoting *Chrysler Workers Ass'n v. Chrysler Corp.,* 663 F.Supp. 1134, 1151 (N.D.Ohio 1986)). Moreover, the government's mere refusal to provide certain confidential information, which may include the identity of criminal suspects not yet indicted, does not necessarily serve as the basis of claim of fraudulent concealment.[25]

In order to receive the benefit of any tolling by reason of fraudulent concealment, the plaintiff "must have failed to discover [the concealed material] facts within the normal limitations period *despite his or her exercise of due diligence." Gonzalez,* 284 F.3d at 292 (emphasis added). Furthermore, conclusory allegations of diligence are insufficient; the plaintiff must "plead with particularity the circumstances surrounding the concealment and state facts showing ... due diligence in trying to uncover the facts." *Gonzalez–Bernal,* 907 F.2d at 250 (quoting *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir.1978)). The reasonable diligence requirement is not lessened in proportion to the gravity of the concealment. *Gonzalez,* 284 F.3d at 292 ("Irrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to

---

**25.** *See Gonzalez–Bernal,* 907 F.2d at 250 ("[T]he government is under no obligation to provide private citizens with information concerning ongoing criminal investigations. Prior to an indictment, governmental authorities are under an obligation not to reveal the existence and nature of an investigation concerning individuals who are merely suspected of criminal activities.... The government is under no duty to announce its suspicions or internal investigations to the 'world at large.'" (quoting *Dyniewicz v. United States,* 742 F.2d 484, 487 (9th Cir.1984))).

exercise due diligence ...." (quoting *Truck Drivers & Helpers Union, Local No. 170 v. NLRB*, 993 F.2d 990, 998 (1st Cir.1993))). Implicit in the concept of due diligence is the requirement that a plaintiff seeking to invoke the doctrine of fraudulent concealment must pursue all reasonable avenues of inquiry. She cannot abandon her investigation if one source of information is unproductive, and it would be reasonable to investigate other sources. *See, e.g., Prudential Ins. Co. of Am. v. United States Gypsum Co.*, 359 F.3d 226, 238 (3d Cir.2004) (explaining that statute of limitations for RICO claim was not tolled even if asbestos manufacturer had engaged in fraudulent concealment because the plaintiff had failed to exercise due diligence by ignoring "many other sources of information" regarding injuries resulting from asbestos exposure); *Demars v. General Dynamics Corp.*, 779 F.2d 95, 99 (1st Cir.1985) (explaining that even if union engaged in fraudulent concealment by failing to inform employee about the disposition of his grievance, statute of limitations was not tolled where employee lacked diligence in making independent inquiry into grievance status). This is especially true where the plaintiff does or should disbelieve the defendant's false representations. *See, e.g., Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir.1986) (explaining that plaintiffs could not have reasonably relied on federal government's allegedly fictitious report that trespassing juveniles accidentally caused fire destroying plaintiffs' property when the plaintiffs knew that the fire marshal discovered an incendiary device immediately after the fire), *disagreed with on other grounds in Skwira*, 344 F.3d at 79;

*Prudential Ins.*, 359 F.3d at 238 (explaining that, in determining what constitutes "due diligence" for purposes of the doctrine of fraudulent concealment, the court "must consider the magnitude of the existing storm warnings. The more ominous the warnings, the more extensive the expected inquiry." (quoting *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 255 (3d Cir.2001))).[26]

In sum, the accrual of a claim—whether by the "discovery rule," statute, or some other doctrine—starts the clock on the period of limitations. Where a defendant's deceptive conduct prevents a *diligent* plaintiff from discovering facts material to her claim, the doctrine of fraudulent concealment stops the clock. To continue to suspend the running of the limitations period, the plaintiff must forge ahead with her reasonably diligent investigation of the facts necessary to her claim. The clock resumes either when the plaintiff ceases to be diligent in her investigation or when she is again able to uncover the information she needs to decide whether to bring an administrative claim.

### 2. The Plaintiff's Argument for Fraudulent Concealment

██ As noted above, the plaintiff argues that from August 1999 until Martorano's 2001 plea of guilty to Callahan's murder, the government fraudulently concealed the plaintiff's action from her. The alleged fraudulent concealment consisted of the government's refusal to provide information concerning Callahan's death and suggestions to the plaintiff that she not believe what she read in the newspapers:

**26.** *Cf. General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 13 (1st Cir. 1986) (investors did not exercise due diligence in discovering investment fraud by merely relying on the assurances of promoter and broker of business venture soliciting investments; "[I]t behooved the investors to look beyond the personal assurances of these two persons. It is clear that with the power available to make their own inspections and evaluations, their discovery efforts must be characterized as minimal.").

At some point, the government knew who killed John B. Callahan. The first time it released a hint of such knowledge was in August of 1999 when the meeting with Mary Jane Callahan was conducted. This meeting notwithstanding, the government refused to disclose the identity of this person to the decedent's widow. Similarly, Mary Jane Callahan exercised due diligence from 1982 until the time she finally learned the identity of the murderer. She asked law enforcement at all possible times who killed her husband. However, the concerns of the government lied [sic] elsewhere. It was concerned with John Callahan's money. It constantly refused to provide answers to the question most important to the victim's family.

Pl.'s Opp. U.S. Mot. Dismiss at 13–14.

In the plaintiff's view, the government's position that her claim accrued prior to May 14, 2000 "overlooks the improper government concealment of its knowledge of the facts surrounding the murder"[27] and the "more troubling" fact that the government told the plaintiff sometime after August 1999 that she should not believe articles in the media about her husband. *Id.* at 15–16. The plaintiff seems to argue that this representation negated any information she might have obtained from various news reports in September and on October 1, 1999 concerning Martorano's plea and of the issue of the *Salemme* decision.

My review of the circumstances of this case leads me inescapably to the conclusion that the plaintiff cannot avail herself of the doctrine of fraudulent concealment. As a threshold matter, because the plain-

tiff knew or should have known the factual basis of her claim (*i.e.*, the level of knowledge that triggers accrual even though further investigation may be required before presenting a claim) by October 1, 1999 at the latest, any alleged fraudulent conduct occurring prior to that time is irrelevant. *Salois*, 128 F.3d at 25. As I noted above, there is no need to invoke the doctrine of fraudulent concealment if, under the discovery rule, the claim has not yet accrued. If the government's fraud had been such that it would have been unreasonable for the plaintiff to have been on inquiry notice of her claim until March 2001 or thereafter, then the discovery rule would have provided the plaintiff all the protection she needed by delaying the accrual of her claim. As I have explained above, however, the government's alleged misrepresentations to the plaintiff through October 1, 1999 were not sufficient to prevent the reasonably diligent plaintiff from discovering circumstances of Callahan's death.

The real issue in determining whether there was any fraudulent concealment is whether the government's post-accrual conduct tolled the statute of limitations. Assuming that at least some of the post October 1, 1999 government conduct alleged by the plaintiff was "fraudulent," I find nonetheless the period of limitations was not tolled, because the plaintiff was not reasonably diligent in investigating the material facts of a possible administrative claim. The plaintiff's assertion that her "diligence in pursuing [her investigation] cannot be successfully challenged," Pl.'s Opp. Mot. Dismiss at 20, is simply conclusory and belied by her affidavit. Although

**27.** In support of her assertion that she has adequately pleaded fraudulent concealment, the plaintiff refers to paragraphs 126 through 155 and 228 through 269 of her complaint. Only paragraph 269 concerns any events after October, 1999. Further, paragraph 269 does not contain allegations of fraudulent concealment; it states that, in September and October 2000 the United States indicted Bulger and Flemmi for the murders of Callahan, Wheeler, and Halloran.

the plaintiff avers that she inquired of government agents at "all possible times" concerning the identity of her husband's murder, her narrow choice of sources of information does not satisfy the requirement of reasonable diligence. The plaintiff admits that she mistrusted the government—if not beginning in the 1980's, at least beginning in August 1999. Despite that mistrust, the plaintiff nonetheless limited her inquiries to the very people whom she did not believe and who had an interest in concealing the truth. The level of "diligence" can hardly be called reasonable under the circumstances here. The plaintiff, therefore, can claim no succor from the running of the limitations clock in any concealment of material information by the government.

## IV. CONCLUSION

For the reasons stated above, I hold that the plaintiff's claim accrued no later than October 1, 1999, and that the period of limitations was not subsequently tolled by any government conduct or misconduct. Because the plaintiff presented her administrative claim on May 14, 2002, more than two years after the claim accrued, she has not met the presentment requirement of 28 U.S.C. § 2401(b). I therefore do not have subject matter jurisdiction of the plaintiff's claims against the United States. The motion of the United States to dismiss (docket entry 8) is GRANTED and all claims against the United States are hereby dismissed.

SO ORDERED.