# United States Court of Appeals
## For the First Circuit

---

No. 04-2466

MARY JANE CALLAHAN, ET AL.,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA, ET AL.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

---

Before

Torruella, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

James P. Duggan, on brief, for appellants.
Steve Frank, Attorney, Appellate Staff, Civil Division, with whom Peter D. Keisler, Assistant Attorney General, Michael J. Sullivan, United States Attorney, Jeffrey S. Bucholtz, Deputy Assistant Attorney General, and Robert S. Greenspan, Attorney, Appellate Staff, were on brief, for appellee United States of America.
William A. Brown, with whom Kate Miller Brown, were on brief, for appellee Robert Fitzpatrick.

---

October 18, 2005

---

**TORRUELLA**, **Circuit Judge**.  In this appeal, we consider Plaintiff's claim against the United States under the Federal Tort Claims Act.  The district court found that it did not have subject matter jurisdiction because Plaintiff's claim accrued more than two years before she filed her administrative complaint and that the doctrine of fraudulent concealment did not toll this requirement. Plaintiff contests these findings of the district court.  We affirm.

## I.  Background

Mary Jane Callahan ("Plaintiff"), individually and as administratrix  of the estate of John B. Callahan ("Callahan"), and members of her family filed suit for wrongful death and emotional distress arising from the murder of her husband.  The suit is founded in a long and sordid history between Boston FBI agents and the Winter Hill Gang, an organized crime syndicate in Boston. Defendants are the United States and individuals who were once members of the FBI, the Winter Hill Gang, or both.  This corrupt relationship produced many unfortunate victims, several of whom have already sought relief in the federal courts. See generally McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004); United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999), rev'd in part, sub nom., United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000).

This appeal concerns only Plaintiff's claim as administratrix of Callahan's estate against the United States. The district court dismissed all claims by individual plaintiffs for lack of subject matter jurisdiction for their failure to file an administrative claim. Callahan v. United States, 337 F. Supp. 2d 348, 350 n.1 (D. Mass. 2004). In an order dated September 28, 2004, the district court also dismissed all claims against individual defendants for expiration of the statute of limitations or want of prosecution. Plaintiff does not appeal those dismissals.

The claim against the United States is through the Federal Tort Claims Act (FTCA), under which the United States consents to suits against it in tort. 28 U.S.C. § 1346(b); 28 U.S.C. §§ 2671-2680. One condition of the FTCA is that a plaintiff must file an administrative claim within two years of the accrual of her claim. Id. § 2401(b). Below, the government did not dispute the Plaintiff's jurisdictional allegations, and the district court accepted Plaintiff's allegations as true. Even accepting the Plaintiff's allegations as true, however, the district court found that her claim accrued more than two years before she filed her administrative complaint. The court below thus dismissed the remaining claim for lack of subject matter jurisdiction. Callahan, 377 F. Supp. 2d at 370.

We present a summary of the factual events surrounding Callahan's murder as alleged by the Plaintiff and supplemented by uncontested facts from news reports and court documents. See Valentín v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).

**A.   The Winter Hill Gang and the FBI**

The Winter Hill Gang was the name for the dominant organized crime syndicate in the Boston area in the 1970s and 1980s. The Gang's activities included murder, bribery, extortion, loan sharking, and illegal gambling. James "Whitey" Bulger ("Bulger") and Stephen "The Rifleman" Flemmi ("Flemmi") were two prominent members of the Gang.

In 1967, FBI Agent H. Paul Rico ("Rico") recruited Flemmi as an FBI informant. In 1976, Agent John Connolly ("Connolly") recruited Bulger as an informant. Connolly and Bulger were childhood neighbors in South Boston. Eventually, both Bulger and Flemmi were promoted to the status of "Top Echelon" informant. The Winter Hill Gang's main rival in crime was the Boston branch of La Cosa Nostra, another organized crime syndicate. The FBI wanted to bring down La Cosa Nostra and Bulger and Flemmi were very pleased to help it do so.

This convenient relationship eventually took a turn for the worse. While they were informants, Bulger and Flemmi were responsible for multiple murders, including those of Roger Wheeler, Brian Halloran, and Callahan, to be discussed below. The FBI,

intent on keeping its informants happy, turned a blind eye to their crimes and failed to follow FBI guidelines for dealing with informants. For example, FBI agents interfered with the investigation of Bulger and Flemmi for the murder of Callahan by preventing Oklahoma FBI agents from interviewing them. The FBI also informed Bulger and Flemmi of a "bugged" location to prevent them from incriminating themselves. At the same time, Bulger and Flemmi ingratiated themselves to the FBI by assisting the agents. For example, when FBI Agent John Morris ("Morris"), Agent Connolly's supervisor, was in Georgia for training and he wanted his secretary to fly to meet him for a romantic tryst, Bulger and Flemmi paid for her plane ticket. This cozy relationship created a protective shield around Bulger and Flemmi that emboldened them in their criminal activities -- so much so that at one point Flemmi stated that the FBI gave Bulger and him free reign to commit any crime short of murder.

Eventually, this cozy relationship between the FBI and Bulger and Flemmi broke down when more reputable law enforcement agents charged Bulger and Flemmi with numerous crimes. Agent Connolly tipped off Bulger, who, to this day, is in hiding from law enforcement authorities. Agent Morris was granted immunity for his testimony, and he testified against Flemmi.

**B.  Callahan's Death**

Callahan was chief executive officer of a business called World Jai Alai ("WJA"), owned by one Roger Wheeler ("Wheeler"). WJA operated "frontons" where customers could place bets on the outcome of jai alai matches.  In an unusual coincidence, Callahan hired Rico, now retired from the FBI and the one who had recruited Flemmi as an FBI informant, as head of security for WJA.  Around 1981, Callahan learned that individuals were skimming profits from WJA.  He was concerned and reported his suspicions to Wheeler.[1]  In response, Wheeler began an audit of WJA.  To prevent Wheeler from discovering their profit skimming, Bulger and Flemmi wanted Wheeler killed.  At their direction, John Martorano ("Martorano"), another member of the Winter Hill Gang, murdered Wheeler in May 1981.

In January 1982, one Brian Halloran ("Halloran") began cooperating with the FBI while being prosecuted for an unrelated murder.  He told the FBI that Bulger, Flemmi, and Callahan had asked him to murder Wheeler but that he had declined the offer.[2]

---

[1]  Plaintiff stated rather cryptically in her complaint that "[c]omplaints of this activity fell on deaf ears."  From this we presume that Callahan complained to Wheeler even though other sources portray Callahan less innocently.  See Salemme, 91 F. Supp. 2d at 208-09 ("Wheeler suspected that Callahan was skimming money from World Jai Lai for members of the Winter Hill Gang, including Halloran, Bulger, and Flemmi.  Thus, he fired Callahan . . . and began an audit.") (internal citations omitted).

[2]  Plaintiff does not admit that Callahan partook in any illegal activity or had any involvement with the Winter Hill Gang.  Agent Morris did not believe Halloran's implication of Bulger and Flemmi and thought Halloran was lying.  We will presume that Halloran was

Halloran also stated that Bulger, Flemmi, Callahan, and Martorano were ultimately responsible for Wheeler's murder. Agent Morris relayed this information to Agent Connolly, who in turn informed Bulger and Flemmi. In May 1982, Bulger and Flemmi had Halloran killed to prevent his further cooperation with law enforcement authorities.

In August 1982, Callahan's body was found in the trunk of a car at the Miami airport. Plaintiff makes two allegations as to a direct connection between the FBI and Callahan's death.[3] The first is from Plaintiff's complaint in this suit, and the second is from her administrative complaint.

The first allegation is that the FBI's investigation of the Wheeler murder eventually turned to Callahan. Around June 1982, Connolly informed Bulger and Flemmi that Callahan was under investigation. Although it is not clear how Callahan could have any incriminating information about the Wheeler murder, Bulger and Flemmi directed Martorano to kill Callahan to prevent him from cooperating with law enforcement authorities.

The second allegation is that Callahan told Rico that he feared that Wheeler's death was related to Wheeler's knowledge of the profit skimming at WJA. Rico told this to Morris and Connolly

lying and that Callahan was an upstanding citizen.

[3] Both contentions are nothing more than conclusory allegations with no support in the record.

who in turn told Bulger and Flemmi. Bulger and Flemmi directed Martorano to kill Callahan because he knew of their profit skimming.

## C. News Reports of FBI Misconduct

As early as March 1996, Boston newspapers reported possible FBI complicity in the Callahan murder. A March 1996 article reported that Callahan, Bulger, and Flemmi had asked Halloran to kill Wheeler; Callahan told Halloran that Martorano had killed Wheeler with Flemmi's help; investigators were probing whether the Wheeler, Halloran, and Callahan murders were related; and "sources and published reports have long said that Bulger was an informant for the FBI." Ralph Ranalli, The Jai Alai Murders, Boston Herald, Mar. 10-11, 1996. A July 1997 article stated that the FBI kept using Bulger and Flemmi as informants even though they were suspects in the murders of Wheeler, Halloran, and Callahan. Ralph Ranalli, FBI Used Whitey Despite his Ties to Three Murders, Boston Herald, July 7, 1997. A December 1997 article reported that federal court hearings will "probe whether FBI agents and federal organized crime prosecutors violated any federal laws or guidelines in the way they handled informants" like Bulger and Flemmi, and that Florida police investigating the Callahan murder are "hoping [the] hearings . . . will lead to a break in the case." Ralph Ranalli, Police Reopen Mob Murder Probe, Boston Herald, Dec. 15, 1997.

National television broadcasts reported similar information. On March 15, 1998, the broadcast "CNN Impact" reported that Bulger and Flemmi were FBI informants and that possible connections existed between Bulger and Flemmi and the murders of Wheeler, Halloran, and Callahan. On May 10, 1998, the television program "60 Minutes" reported that Flemmi stated that the FBI gave Bulger and him "free reign to commit just about any crime." The broadcast also referred to the Callahan murder and stated that the FBI might "have allowed [Bulger and Flemmi] to get away with murder."

## D. Agent Morris's 1998 Testimony

Agent Morris testified in April 1998 that the FBI had informed Bulger and Flemmi that Halloran was implicating them in Wheeler's murder and that he believed that Bulger and Flemmi may have killed Halloran. Salemme, 91 F. Supp. 2d at 209. Agent Morris also testified that he informed Bulger and Flemmi of a location bugged by Massachusetts State Police to prevent them from incriminating themselves. Id. at 202. Boston newspapers reported his sensational testimony. See Shelley Murphy, Worst Fears Came True as Informant Lost Race for his Life, Boston Globe, Apr. 23, 1998; Ralph Ranalli, Ex-FBI Honcho: Agent Tipped Mobsters on Stoolie, Boston Herald, Apr. 23, 1998.

## E. Martorano's Plea Agreement

Long before Martorano agreed to plead guilty to a score of murders, Boston newspapers reported that Martorano was a suspect in the Callahan murder and that a possible plea bargain was in the works between Martorano and federal prosecutors. See Ralph Ranalli, Gangster's Mob Testimony Held up by Agency Fighting, Boston Herald, Nov. 16, 1998; Ralph Ranalli, States Close in on Deal to Hear Mobster, Boston Herald, Feb. 4, 1999; Andrea Estes & Ralph Ranalli, Reputed Mobster on Verge of Plea-Bargain Deal, Boston Herald, May 13, 1999.

On September 9, 1999, portions of Martorano's agreement to plead guilty to a number of murders, including the Callahan murder, were made public.[4] Boston newspapers heavily reported the plea agreement, including that he would plead guilty to the murder of Callahan. A September 12 article also reported that Martorano would implicate Bulger and Flemmi, even though this portion of the plea agreement remained sealed. Andrea Estes, Outraged Hit Man Turned Rat for Revenge, Boston Herald, Sept. 12, 1999. The same article quoted Mrs. Callahan as trying to forgive Martorano for killing Callahan. Id. The article also stated that Wheeler had "suspected the Winter Hill Gang was skimming profits" from his company and that "Martorano believes the FBI told Flemmi and Bulger

---

[4] The portion that remained sealed listed individuals Martorano would testify against in exchange for his plea. Callahan, 337 F. Supp. 2d at 352 n.4.

-10-

about Wheeler's suspicions." Id.  See also Andrea Estes, Notorious Mobster Strikes Plea bargain with Feds, Boston Herald, Sept. 9, 1999 (reporting that Martorano agreed to plead guilty to the murder of Callahan and that "Callahan . . . helped Bulger and Flemmi orchestrate Wheeler's murder and had to be killed to prevent him from squealing"); Andrea Estes, Murderous Rats Mobster Ties Bulger, Flemmi to Murders, Boston Herald, Sept. 10, 1999 ("[Martorano] will . . . accuse [Bulger and Flemmi] of ordering the murder of John Callahan . . . ."); Shelley Murphy, US Attorney Defends Deal with Hit Man, Boston Globe, Sept. 10, 1999 (reporting that Martorano would "plead guilty to the murder of Callahan").

On September 30, 1999, Martorano admitted to the murders of ten persons, not including Wheeler and Callahan, in federal court.  Boston newspapers reported this event and also noted that Martorano would later plead guilty to the murders of Wheeler and Callahan.  Andrea Estes, Hitman Cops to Killings in Squeal Deal, Boston Herald, Oct. 1, 1999.

On March 20, 2001, Martorano pleaded guilty in Florida state court to murdering Callahan.

**F.  Judge Wolf's Opinion in United States v. Salemme**

On September 15, 1999, Judge Wolf issued his opinion in United States v. Salemme, detailing the corrupt relationship between Bulger, Flemmi, and the FBI.  Of particular relevance here, the opinion contained a section titled "The Wheeler, Halloran, and

-11-

Callahan Murders" where Judge Wolf discussed the connections between the three murders, Bulger and Flemmi, and the FBI. Salemme, 91 F. Supp. 2d at 208-13. For example, he noted how FBI agents protected Bulger and Flemmi from prosecution for the Callahan murder by preventing Oklahoma FBI agents from interviewing them. Id. at 211-13. In addition, he discussed how Bulger and Flemmi paid for Agent Morris's secretary to fly to meet Morris for a romantic tryst. Id. at 210. Boston newspapers reported the sensational details the next day. Shelley Murphy, Bulger Tip-off Gains Credence; Judge Believes FBI Agent Told Gangster of Indictment, Boston Globe, Sept. 16, 1999; Andrea Estes, Judge Blasts FBI Over Deal with Killers Whitey and Flemmi; Judge Says Hub FBI Broke all the Rules, Boston Herald, Sept. 16, 1999.

**G. FBI's Interactions with Plaintiff**

Soon after the murder of Callahan, FBI agents met Plaintiff and told her that Callahan's murder "was not a professional hit" and that he was "probably killed by Cuban gangsters." Several times between 1982 and 2001, when Martorano pleaded guilty to the murder of Callahan, Plaintiff asked FBI agents about the murder of Callahan, and FBI agents refused to tell her anything.

On August 30, 1999, Plaintiff met with FBI agents at the agents' request. The agents told her of a possible plea agreement with the man who murdered Callahan, but they refused to state his

name.  Plaintiff specifically asked FBI agents "whether certain newspaper accounts involving [Callahan's murder] and John Martarano [sic] were true," and the agents responded that she "should not rely on newspaper accounts" and that "the reports were inaccurate."

## H.  Plaintiff's Administrative Complaint

On May 14, 2002, Plaintiff filed an administrative complaint with the FBI on behalf of Callahan's estate claiming

> in April of 2001, one John Martorano admitted to killing Callahan. Claimant then learned that Martorano was hired to kill her husband on behalf of [Bulger and Flemmi].  Bulger and Flemmi learned that the victim had information that they were "skimming" profits from World Jai Alai in Miami.  Bulger and Flemmi learned this from H. Paul Rico . . . .  The information was passed from Rico to FBI agents Morris and Connolly who in turn alerted Bulger and Flemmi.

## II.  Accrual under the FTCA

"It is 'elementary' that the United States, as sovereign, is immune from suit unless it has consented to be sued." Skwira v. United States, 344 F.3d 64, 72 (1st Cir. 2003) (citing United States v. Mitchell, 445 U.S. 535, 538 (1980)).  "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."  Lane v. Peña, 518 U.S. 187, 192 (1996).  The Federal Tort Claims Act (FTCA) waives sovereign immunity by giving consent to suits "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the

-13-

Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b); 28 U.S.C. §§ 2671-2680. One condition of this waiver is that a claim "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." Id. § 2401(b). "[T]he general rule under the [FTCA is] that a tort claim accrues at the time of the plaintiff's injury." United States v. Kubrick, 444 U.S. 111, 120 (1979).

## A. Discovery Rule

In Kubrick, the Supreme Court recognized a discovery rule for medical malpractice claims under the FTCA. Id. at 113. Under the discovery rule, the plaintiff's claim accrues when she "knows both the existence and the cause of [her] injury." Id. We have previously considered the Supreme Court's reasoning in Kubrick and applied the discovery rule to claims under the FTCA involving theft, Attallah v. United States, 955 F.2d 776, 778-79 (1st Cir. 1992), and wrongful death, Skwira, 344 F.3d at 75. For claims other than medical malpractice, we apply a more forgiving rule because "the identity of the individual(s) responsible for an injury may be less evident." Id. at 77. In such cases, a plaintiff's claim accrues only when she also knows "that there is a causal connection between the government and her injury." Id. at 78.

The "knowledge" standard under the discovery rule has two qualifications. First, "something less than definitive knowledge is required." Skwira, 344 F.3d at 78. Accrual is triggered by "the discovery of sufficient facts about the injury and its cause to prompt a reasonable person to inquire and seek advice preliminary to deciding if there is a basis for filing an administrative claim against the government." Id. Second, a plaintiff is charged with knowledge of facts which "in the exercise of reasonable diligence [she] should have discovered." González v. United States, 284 F.3d 281, 288 (1st Cir. 2002). This is an objective standard. Id.

Plaintiff filed an administrative claim with the FBI on May 14, 2002. The United States argues that her suit is barred because her claim accrued more than two years before this date. We must therefore determine (1) what facts relevant to her claim Plaintiff knew or should have known, and (2) whether Plaintiff had sufficient facts about the existence of her injury (that Callahan was killed), the cause of her injury (that Bulger and Flemmi had Callahan killed), and a causal connection between her injury and the government to prompt her to "inquire and seek advice preliminary to deciding if there is a basis for filing an administrative claim against the government." Skwira, 344 F.3d at 78. Plaintiff clearly knew of her injuries soon after Callahan's death. Thus, we must determine the facts relevant to showing that

-15-

Bulger and Flemmi had Callahan killed and showing that the government was causally connected to the murder.

The dismissal of the complaint in this case was not based on what facts Plaintiff actually knew. Rather, the district court concluded, in light of a variety of uncontested facts, that Plaintiff should have known of her claim by October 1, 1999. Here, as below, the facts themselves are not at issue. We determine only whether the judge was correct to conclude, as a matter of law, that the court lacked subject matter jurisdiction because Plaintiff objectively should have known of her claim by October 1, 1999. While review of Rule 12(b)(1) dismissals requires deference to a judge's factual findings, our review of this case, which involves only a question of law, is de novo. Valentín, 254 F.3d at 363. See also Skwira, 344 F.3d at 71-72.

Plaintiff's complaint describes two possible theories of causation. The first theory is that the FBI created a "protective shield" around Bulger and Flemmi. This protective shield not only allowed them to escape prosecution for past crimes but emboldened them to commit future crimes. The second theory, and the one emphasized on appeal, is that the FBI told Bulger and Flemmi information that prompted them to kill Callahan. The information was either that the FBI was seeking information from Callahan regarding the Wheeler murder or that Callahan knew that Bulger and Flemmi were skimming profits from WJA.

-16-

These two theories roughly correspond to the two theories this court considered for the two groups of appellants in McIntyre v. United States. 367 F.3d 38, 53-54, 57-58 (1st Cir. 2004). For the Wheeler appellants (family of the same Wheeler referred to in this case), we addressed the claim that the FBI "provided Bulger and Flemmi with a 'protective shield' against prosecution and investigation that gave the two criminals the opportunity to commit crimes and emboldened them to do so, proximately causing Wheeler's murder." Id. at 58. For the McIntyre appellants, we addressed the claim that "the FBI caused McIntyre's death . . . by leaking his confidential informant status to Bulger and Flemmi, in violation of a special duty of non-disclosure owed to him by the government." Id. at 54. Although the two theories are "fundamentally different," id. at 57, the dispositive issue for the Wheelers and the McIntyres was not the theory itself, but when the plaintiffs knew or should have known of the facts supporting the theory, id. at 54-55, 59.

In McIntyre, we specifically reserved the question of whether a plaintiff could put forth multiple theories of causation for the same tort. Id. at 54 n.6. We now hold that although a plaintiff is free to put forth multiple theories of causation, the only relevant theory for purposes of tolling the statute of limitations is the first one in time to establish the requisite causation. A plaintiff's claim accrues at the time when she knew

-17-

or should have known of a causal connection between her injury and the government.  Thus, a claim accrues if there is _any_ causal connection.  Putting forth a specific theory of causation based on particular facts does not help a plaintiff, because only the earliest theory of causation matters for accrual analysis.[5]

In this case, Plaintiff is emphasizing her second theory on appeal, presumably because it will create a later accrual date than her first theory.  The second theory, however, cannot change the fact that causation could have been known at an earlier date under the first theory.  Even if Plaintiff discovered tomorrow a new, crucial fact related to causation -- e.g., that Agent Connolly gave Martorano the gun used to kill Callahan -- Plaintiff could not change the fact that she should have known of causation at an earlier date.  We will thus determine accrual under Plaintiff's first theory.

We now turn to when Plaintiff's claim accrued.  The court below held that Plaintiff's claim accrued no later than October 1, 1999, this date being soon after the news reporting of Martorano's plea agreement and Judge Wolf's _Salemme_ opinion.  On appeal, Plaintiff contends that her claim could not have accrued until after May 14, 2000 and points to the fact that Martorano did not

---

[5] Since the date of accrual determines the power of this court to hear the case, we need not accept any of plaintiff's theories and could interpose our own theory consistent with the facts of the case.

-18-

formally plead guilty to the murder of Callahan until March 20, 2001. We agree with the court below that Plaintiff's claim accrued no later than October 1, 1999.

We must address what Plaintiff should have known regarding the cause of Callahan's death and the causal connection between the government and his death. We will consider national and Boston news reporting because "[w]here events receive widespread publicity, plaintiffs may be charged with knowledge of their occurrence." McIntyre, 367 F.3d at 60 (internal quotation marks omitted). Numerous articles in Boston newspapers, as early as 1996, speculated that Bulger and Flemmi killed Wheeler, Halloran, and Callahan and that the FBI was somehow involved. See supra Part I.C. In 1998, two nationwide news broadcasts, "CNN Impact" and "60 Minutes," also speculated that Bulger and Flemmi killed Callahan, possibly with the acquiescence of the FBI. Id.

Most importantly, Boston newspapers heavily reported three events from federal court proceedings connected with the Callahan murder. The first event was FBI Agent Morris's testimony in April 1998 that the FBI had informed Bulger and Flemmi that Halloran was implicating them in Wheeler's murder and that he believed that Bulger and Flemmi may have killed Halloran. Agent Morris also testified that he informed Bulger and Flemmi of a bugged location that they should avoid. The Boston Globe and Boston Herald reported his testimony the next day. See supra Part

I.D.  While his testimony was not directly connected with the Callahan murder, the Wheeler, Halloran, and Callahan murders were long thought to be related.  See supra Part I.C.  For example, a December 1997 article reported that federal court hearings will "probe whether FBI agents and federal organized crime prosecutors violated any federal laws or guidelines in the way they handled informants" like Bulger and Flemmi, and that Florida police investigating the Callahan murder are "hoping [the] hearings . . . will lead to a break in the case."  Ralph Ranalli, Police Reopen Mob Murder Probe, Boston Herald, Dec. 15, 1997.

The second event, made public on September 9, 1999, was Martorano's agreement to plead guilty to a number of murders, including the murder of Callahan.  In the following days, Boston newspapers published several articles about Martorano's plea agreement and his willingness to implicate Bulger and Flemmi.  See supra Part I.E.  Further, Plaintiff was quoted in a September 12, 1999 article, saying that she was trying to forgive Martorano, the killer of her husband.  Andrea Estes, Outraged Hit Man Turned Rat for Revenge, Boston Herald, Sept. 12, 1999.  The same article clearly indicates that Bulger and Flemmi were involved in the Callahan murder and that Martorano would implicate them.  Id.

The third event was the publication of Judge Wolf's opinion in United States v. Salemme on September 15, 1999.  As we have already noted, his opinion discussed in depth the corrupt

relationship between the FBI, Bulger, and Flemmi. That Judge Wolf's opinion contains a section titled "The Wheeler, Halloran, and Callahan Murders" where he discusses the connections between the three murders, Bulger and Flemmi, and the FBI is particularly relevant. Salemme, 91 F. Supp. 2d at 208-13. He details specific instances of clear misconduct, including attempts by the FBI to protect Bulger and Flemmi from prosecution, and attempts by Bulger and Flemmi to curry favor with the FBI agents. See supra Part I.F.

Given the extensive news reporting and the close connection of the events to her husband's death, we find that Plaintiff should have known the basic facts underlying these three events. Further, the reporting on these three events should have prompted Plaintiff to obtain certain publicly available documents, namely Morris's 1998 testimony, Martorano's plea agreement, and the Salemme decision.

The facts that Plaintiff should have known would have "prompt[ed] a reasonable person to inquire and seek advice preliminary to deciding if there [was] a basis for filing an administrative claim against the government." Skwira, 344 F.3d at 78. John Martorano's plea agreement and Judge Wolf's opinion easily provide the requisite knowledge under the discovery rule that Bulger and Flemmi were responsible for the murder of Callahan. Moreover, Agent Morris's testimony and Judge Wolf's opinion easily provide the requisite knowledge that the FBI protected Bulger and

Flemmi from prosecution and emboldened them to commit crimes, including the murder of Callahan.

Plaintiff argues that conflicting information reasonably prevented her filing an administrative claim. First, she emphasizes that the FBI would not release the name of Callahan's killer as late as April 2000. Given Martorano's plea agreement, made public on September 9, 1999, we find this argument unavailing. Second, she contends that the FBI told her that she "should not rely on newspaper stories" and that "reports were inaccurate." However, such statements do not specifically contradict any relevant information and even if they did, Plaintiff could surely rely on publicly available court documents for accurate information. Third, plaintiff argues that in the face of conflicting newspaper stories, she did not have sufficient, reliable information. Although she does not cite the newspaper articles, she claims that as late as 1997 newspapers reported government denials of a corrupt relationship between the FBI and Bulger and Flemmi. However, the lack of conflicting stories in 1998 and 1999 and the publicly available court documents allow us to easily dispose of this argument. Finally, Plaintiff makes much of a statement in Judge Wolf's September 15, 1999 opinion:

> As a result of the delayed disclosure of the Halloran documents by the government and of the failure of the adversary system to operate fully and effectively on this issue, questions remain regarding the role, if any, played by Bulger and Flemmi in the Wheeler, Halloran,

-22-

and Callahan murders, and the full degree to which the FBI in Boston has, from 1981 until recently, attempted to keep and such role from being discerned and demonstrated.

This statement, however, hurts Plaintiff more than it helps her. Certainty is not required for a claim to accrue. Rather, Judge Wolf's statement would prompt a reasonable person to further investigate the matter by seeking legal advice in order to determine whether action should be taken against the government. This is all that is required for accrual. Skwira, 344 F.3d at 78.

## B. Fraudulent Concealment

Like the discovery rule, the doctrine of fraudulent concealment is a means available to plaintiffs seeking to toll the statute of limitations. In order for a plaintiff to prevail on a fraudulent concealment claim, the defendant "'must have engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and the plaintiff must have failed to discover these facts within the normal limitations period despite his exercise of due diligence.'" Torres Ramírez v. Bermúdez García, 898 F.2d 224, 229 (1st Cir. 1990) (quoting Hernández Jiménez v. Calero Toledo, 604 F.2d 99, 101 (1st Cir. 1979)). During the course of this sordid affair, the FBI almost surely engaged in fraudulent concealment by denying any FBI complicity in the criminal activities of Bulger and Flemmi. We need not specifically address this, however, because we find that any fraudulent concealment by the FBI ended no later than October 1, 1999.

-23-

Plaintiff claims that the FBI engaged in fraudulent concealment when agents refused to tell her who killed Callahan. Any purported fraudulent concealment of this fact ended when portions of Martorano's plea agreement were made public on September 9, 1999. The public portion of the plea agreement stated that Martorano would plead guilty to the murder of Callahan. Even if after this date FBI agents refused to tell Plaintiff who killed Callahan, this fact was no longer concealed.

Plaintiff also claims fraudulent concealment as a result of FBI agents' statements to her that she "should not rely on newspaper stories" and that "reports were inaccurate." Such general statements cannot rise to the level of fraudulent concealment because they do not even indicate which newspaper stories are inaccurate or should not be relied upon. Further, the statements have a non-fraudulent explanation. The FBI agents could simply have been evading Plaintiff's questions because they did not wish to discuss a pending criminal prosecution.

We have already decided in considering the discovery rule that Plaintiff should have known of sufficient facts by October 1, 1999 to prompt a reasonable person to file an administrative claim. The reason that Plaintiff should have known of these facts is that they were easily discoverable had she diligently (or even not so diligently) kept herself informed of the legal proceedings and news reporting of events closely related to Callahan's murder. Thus,

Plaintiff had either discovered the purportedly concealed information or was not diligent in seeking to obtain it. Either way, we find no fraudulent concealment.

### III.  Conclusion

Because we find that Plaintiff's claim accrued no later than October 1, 1999, which was more than two years before she filed her administrative claim, and we find that any fraudulent concealment by the government ended before this date, we affirm the district court's dismissal for lack of subject matter jurisdiction under the FTCA.

**Affirmed**.