# United States Court of Appeals
## For the First Circuit

Nos. 09-1950
    10-1766

PATRICIA DONAHUE, INDIVIDUALLY AND IN HER CAPACITY
AS ADMINISTRATRIX OF THE ESTATE OF MICHAEL J. DONAHUE;
MICHAEL T. DONAHUE; SHAWN DONAHUE; AND THOMAS DONAHUE,
Plaintiffs, Appellees,

v.

UNITED STATES OF AMERICA,
Defendant, Appellant.

_____

Nos. 09-1951
    09-1952

THE ESTATE OF EDWARD BRIAN HALLORAN, BY PATRICIA MACARELLI, IN
HER CAPACITY AS ADMINISTRATRIX OF THE ESTATE,
Plaintiff, Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,
Defendant, Appellant/Cross-Appellee.

_____

Before
Lynch, <u>Chief Judge</u>,
Torruella, Selya, Boudin, Lipez, Howard and Thompson,
<u>Circuit Judges</u>.

_____

**ORDER OF COURT**
**Entered: October 6, 2011**

The petition for rehearing having been denied by the panel of judges who decided the case, and the petition for rehearing en banc having been submitted to the active judges of this court and a majority of the judges not having voted that the

case be heard en banc, it is ordered that the petition for rehearing and the petition for rehearing en banc be denied.

**LYNCH, Chief Judge, BOUDIN and HOWARD, Circuit Judges, statement on denial of rehearing en banc.** Under the Constitution, federal courts may not make decisions based on sympathy to parties and may not displace the judgments made by Congress in non-constitutional matters. The legal issue presented by these cases is not whether the conduct of the FBI was shameful; it was. It is not whether plaintiffs are victims of that conduct; they are.

However wronged the plaintiffs, the issue is whether these plaintiffs have complied with the stringent limitation period set by Congress for claims under the Federal Tort Claims Act. 28 U.S.C. § 2401(b). Because the money to pay victims comes from the United States, those time limits as a matter of law are required to be strictly construed. United States v. Kubrick, 444 U.S. 111, 117-18 (1979). Whether the federal courts even have jurisdiction over the claim depends upon the timely filing of an administrative notice of claim. 28 U.S.C. §§ 2401(b), 2675(a); Kubrick, 444 U.S. at 117. Our case law requires that the point of view of an objectively reasonable person be used, not the point of view of the particular plaintiffs. Cascone v. United States, 370 F.3d 95, 104 (1st Cir. 2004); McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004).

There were many well-publicized admissions --

-2-

particularly those of FBI Agent Morris whose dramatic courtroom disclosures specifically about the FBI's role in the May 11, 1982, double murder of Halloran and Donahue were corroborated by several other witnesses -- which put objectively reasonable persons on notice of these claims. Despite this, plaintiffs did not act within the required time limits to file the required claims. It is an easy step to file a claim. A majority of a panel of this court, which took these claims very seriously, concluded that the plaintiffs did not file a timely claim, in light of the arguments made and evidence presented by plaintiffs. The courts cannot assume the role of advocates and create arguments never made. Nor was there any error in the legal standards used in making that decision.

That the courts have no jurisdiction to hear a law suit for damages under the FTCA because of plaintiffs' delay does not mean that the two other branches of government are precluded from providing a remedy. That is a decision for the Congress and for the Executive, not for the federal courts, which have no jurisdiction to award relief.

**TORRUELLA**, <u>**Circuit Judge**</u>, **concerning the denial of en banc review.** Some cases are of "exceptional importance"[1] because of the potential they have to affect the lives of millions of people. <u>See</u>, <u>e.g.</u>, <u>Igartúa, et al.</u> v. <u>United States</u>, No. 09-2186,

---

[1]<u>See</u> Fed. R. App. P. 35(a)(2).

-3-

__F.3d __, 2011 WL 3340120, *2 (1st Cir. Aug. 4, 2011) (Torruella, J., dissenting). Other cases are of exceptional importance because of the light they cast on our public institutions. The latter, while not always directly affecting as broad a segment of the population, are nevertheless exceptionally important by virtue of what they demonstrate about the trust that we -- for better or worse -- place in those institutions. This is one of those cases. Yet barely a month since a divided vote in Igartúa denied 4 million United States citizens residing in Puerto Rico review of constitutional issues of exceptional importance, this court continues this noxious pattern and once again prevents consideration by the full court of questions of exceptional importance. By this action it allows the government's outrageous conduct to remain free of any consequence, and as in Igartúa, perpetrates a monstrous injustice on another, albeit smaller, but no less worthy, group of hapless citizens.

This is not the appropriate occasion for revisiting in any detail my disagreement with the panel's majority opinion. I indicate here only the grounds for my belief that the error presented in this case is sufficiently important to merit en banc review.

Beyond its implications for the Donahue and Halloran families, this case has thrust renewed attention on the FBI's reliance on confidential criminal informants, and the obvious ways

in which this relationship can become too cozy for comfort.  Public trust in our institutions requires that when these institutions stray, they be held accountable and made to absorb the costs of their conduct.  They ought not be perceived as operating with de facto impunity.  Although it is hoped that these agencies will learn from these dreadful examples of government gone amuck, future reform is of little consolation to those injured by official malfeasance.

This concern would be important even if our cases required the panel's result.  But they do not.  The government's claim that the Donahue and Halloran estates filed their claims too late rests on an astonishingly one-sided understanding of what reasonableness requires.  The panel majority pins the accrual date as September 2, 1998, based upon publicity arising from FBI Agent Morris's revelations about the leak of Halloran's identity to Bulger.  I cannot see in what way it is "reasonable" to expect surviving family members to credit prima facie outrageous speculation in the papers that high-level and systemic FBI corruption may have contributed to their injury, particularly when -- as here -- the government had repeatedly assured them over the years that someone else was responsible.  Is it so unreasonable for citizens to rely on what their government was repeatedly asserting as the truth?  Can the government be allowed to benefit from its own perfidious conduct in duping its own citizens with stonewalling

and outright lies?  Are citizens to be held to such a standard of cynicism in their dealings with government, especially with such hallowed agencies as the FBI?

Moreover, as the parties have represented, even if the publicity surrounding Morris's revelations triggered a duty to inquire, that alone is not sufficient for accrual.  See McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004) (stating that although a "mere hunch, hint, suspicion, or rumor of a claim" may "give rise to a duty to inquire into the possible existence of a claim," a claim "does not accrue" on that basis) (first emphasis in original, second emphasis added).  What triggers accrual is having enough information at one's disposal to file a claim -- in other words, accrual occurs at the rational endpoint of inquiry, not at its outset.  Cf. Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784, 1797 (2010) (rejecting argument that limitations period under 28 U.S.C. § 1658(b)(1), which runs from "discovery" of violation, begins to run "when a plaintiff would have begun investigating") (emphasis in original).  It is hard to see how it could be otherwise, as I can see no reason to think there is a usefully general answer to the question of what the period of time should be between when inquiry begins and when it will yield sufficient evidence to support filing an FTCA claim.  Given that the government was actively stonewalling as late as 2005 -- some seven years after Morris's testimony -- even if the parties were on

inquiry notice, they would not have discovered anything useful and reliable until, at the earliest, the publication of Judge Wolf's decision in Salemme in September of 1999.[2]

Taken individually, these concerns -- individual injustice, loss of public trust, and substantial legal error -- might not by themselves justify en banc review. Taken together, I believe they do.

As in Igartúa, the underpinning for this outcome is an anachronistic judicially invented legal theory that has no validity or place in American law -- in this case, sovereign immunity. Two hundred and thirty-five years after we rid ourselves of King George III and his despotic ascendancy over colonial America, we cling to a doctrine that was originally based on the Medieval notion that "the King can do no wrong." This maxim was blindly accepted into American law under the assumption that it was incorporated as part of the common law in existence when our Nation separated from England. See Owen v. City of Independence, Mo., 445 U.S. 622, 645 n.28 (1980). However, this assumption does not withstand historical scrutiny. See Edwin M. Borchard, Governmental Responsibility in Tort (pt. VI), 36 Yale L. J. 1, 17-41 (1926). Furthermore, the present case is the quintessential example of the fact that at times the government can, and does, do wrong.

_____

    [2]See United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999).

-7-

More importantly, the doctrine of sovereign immunity cannot be sustained in the face of our constitutional structure. Although its language is far from specific in many parts, the Constitution nevertheless contains nothing, specific or implied, adopting the absolutist principal upon which sovereign immunity rests. Furthermore, the record of the debates preceding the adoption of the Constitution are bare of any language or asseveration that might serve as a basis for support of this monarchist anachronism. See generally Erwin Chemerinsky, Against Sovereign Immunity, 53 Stan. L. Rev. 1201 (2001); Susan Randall, Sovereign Immunity and the Uses of History, 812 Neb. L. Rev. 1 (2002). In fact, the establishment in this country of a republican form of government, in which sovereignty does not repose on any single individual or institution, made it clear that neither the government nor any part thereof could be considered as being in the same infallible position as the English king had been, and thus immune from responsibility for harm that it caused its citizens.

Not only is sovereign immunity inconsistent with a central tenet of American government that no one, including the government, is above the law, it also runs contrary to specific, fundamental provisions of the Constitution: the Supremacy Clause[3] and the Due Process Clause of the Fifth Amendment.[4] Even assuming

---

[3]U.S. Const. art. VI, § 2, cl. 2.

[4]U.S. Const. amend. V.

arquendo that the doctrine of sovereign immunity was part of English common law, its transference to our legal system would have been prevented, and was trumped, by the Constitution and its Supremacy Clause, and especially by the Due Process Clause, which requires that the tortuous deprivation of the lives of citizens by the government's felonious agents and partners be duly compensated.

Many jurisdictions have recognized the incompatibility of sovereign immunity with democratic principles. In the United States, many state high courts have rejected sovereign immunity as fundamentally unjust. See, e.g., Muskopf v. Corning Hosp. Dist., 359 P.2d 457, 458 (Cal. 1961); Molitor v. Kaneland Community Unit Dist., 163 N.E.2d 89, 94 (Ill. 1959); Barker v. City of Santa Fe, 136 P.2d 480, 482 (N.M. 1943). As a result of judicial and legislative action, "only a handful of States still cling to the old common-law rule of immunity for governmental functions." Owen, 445 U.S. at 645 n.28. Globally, there is a trend among major democratic nations towards the abolition of sovereign immunity. See Denise Gillman, Calling the United States' Bluff: How Sovereign Immunity Undermines the United States' Claim to an Effective Domestic Human Rights System, 95 Geo. L. J. 591, 636-46 (2007). Even the United Kingdom, from which it is believed (wrongly, see Borchard, supra) the American notion of sovereign immunity derived, abrogated the government's immunity from suits in tort through the Crown Proceedings Act of 1947. See James E. Pfander, Government

-9-

Accountability in Europe: A Comparative Assessment, 35 Geo. Wash. Int'l. L. Rev. 611, 615-17 (2003).

The Donahue and Halloran cases are an unfortunate but vivid example that even in the United States, with all our legal and constitutional safeguards, the government can go rogue. Although it is my belief and hope that our system is normally self-corrective, there are times when the courts have a duty to intervene to keep our system within the bounds of decency. This is such a time, but sadly, this court has failed in its duty. The concept of sovereign immunity may be beyond the power of this court to challenge. However, this court had other valid grounds to correct the injustice of the panel opinion. We have in the past tolled the Federal Tort Claims Act's statute of limitations when the government deliberately concealed evidence of its wrongdoing, and there was no reason for us not to do so here. See Attallah v. United States, 955 F.2d 776, 779-80 (1st Cir. 1992) (finding FTCA statute of limitations tolled when government deliberately concealed evidence of murder by Customs employees). Moreover, even if we must respect the notion of sovereign immunity, that respect did not require the harsh and unjust result in this case. The FTCA waives the United States' sovereign immunity for a claim presented within two years after the claim "accrues," 28 U.S.C. 2675(a), and it was within this court's power to interpret the accrual requirement broadly enough to allow the claims in this case to

-10-

proceed.  See United States v. Aetna Cas. & Surety Co., 338 U.S. 366, 383 (1949) ("We think that the congressional attitude in passing the [FTCA] is . . . accurately reflected by [the] statement . . . : 'The exemption of the sovereign from suit involves hardship enough, where consent has been withheld.  We are not to add to its rigor by refinement of construction where consent has been announced.'") (quoting Anderson v. Hayes Constr. Co., 153 N.E. 28, 29-30 (1926) (Cardozo, J.)).  I believe this court should have granted en banc review to petitioners, reversed the decision of the panel, and reinstated the judgment of the district court granting damages to petitioners against the government for its felonious part in the murder of their loved ones.

James "Whitey" Bulger has finally been apprehended, and is now being haled into the federal courthouse in Boston to answer for the crimes he allegedly committed years ago.  But unlike Bulger himself, thanks to the panel majority's decision and the full court's refusal to reverse it, Bulger's most trusted associate -- the Boston FBI office -- has gotten away with murder.  This is the wrong outcome, and most importantly, our law does not require it.  Cf. Attallah, 955 F.2d at 779-80.  The moral of this outcome seems to be that crime does pay, at least for the government.  This case cries for redress, either by the Supreme Court, or by a special bill of Congress.

**LIPEZ**, <u>Circuit Judge</u>, **dissenting from the denial of rehearing en banc.** There is nothing more hollow than expressions of sympathy by judges over an injustice that the law permits them to redress. There was no compelled outcome here. Instead, there was a serious misjudgment that perpetuates a grave injustice. The en banc process permits us to remedy such an injustice by acknowledging the obvious: this is a case of "exceptional importance" that requires deliberation by the full court. <u>See</u> Fed. R. App. P. 35(a)(2).[5] I therefore am once again disheartened that three members of the court have voted to prevent en banc review. <u>See</u> <u>Igartúa</u> v. <u>United States</u>, No. 09-2186, 2011 WL 3340120, at *10 (1st Cir. Aug. 4, 2011) (Lipez, J., dissenting from the denial of rehearing en banc).

It is true that en banc review is reserved for the exceptional case. It is also true that not every "unjust" decision will be a matter of exceptional importance under Rule 35(a). But the denial of en banc review here raises the obvious question: if this case does not warrant the full court's attention, what case does? Two families were tragically harmed by an institution of the federal government. The betrayal of the public trust could not be more egregious. Two district judges and a member of the panel

---

[5]Although en banc rehearing is "not favored," exceptions exist where "en banc consideration is necessary to secure or maintain uniformity of the court's decisions" or "the proceeding involves a question of exceptional importance." Fed. R. Civ. P. 35(a).

first hearing this case have found a basis in law to redress this betrayal. Three members of our court have voted to reconsider the panel's unfortunate decision. Given these circumstances, it is frustrating in the extreme to witness the aversion to en banc review play out again.

This institutional bias against en banc review goes beyond the language of the rule emphasizing that en banc rehearing is generally disfavored. It is grounded, in part, in the human dynamics of an appellate court. The en banc process is deeply divisive. It requires colleagues to review the work of colleagues and sometimes judge that work negatively. There is also a fear that line drawing will become too difficult. If en banc review is granted here, the worry goes, how can we deny it there? These feelings and fears have no place in the en banc calculus. We can move beyond the hard feelings of the en banc process. We can draw distinctions in principled ways. Our job requires us to do these things.

This case is moored deeply in its facts and, ultimately, requires a judgment about when the families should have been on notice of the FBI's "reprehensible" role in their decedents' murders. Donahue v. United States, 634 F.3d 615, 616 (1st Cir. 2011) (using that term to describe the FBI's conduct). In urging en banc review, I acknowledge that the panel majority's conclusion reflects careful thought and a good-faith attempt to deal with

difficult facts.  It is, however, palpably wrong.  The majority
correctly observes that "courts must apply legal rules even-
handedly," id. at 629, and they purport to apply a "rule" that
requires rejection of appellants' claims as time-barred.  But the
issue here does not turn on a bright-line rule; rather, the
question is one of reasonableness.  See id. at 623 ("[T]hese
appeals involve only the objective reasonableness of the
plaintiffs' failure to discern at an earlier time both their injury
and its likely cause.").  Determining whether conduct was
reasonable requires us to make a judgment call.  In making that
call, we fail in our responsibility if we do not test its
correctness by applying what our late First Circuit colleague,
Judge Frank M. Coffin, called "the justice nerve."  See Frank M.
Coffin, The Ways of a Judge: Reflections from the Federal Appellate
Bench 222 (1980).

To be sure, we may not disregard applicable legal
doctrine simply to accomplish justice.  No matter what the
equities, we may not "take it upon ourselves to extend the waiver
[of sovereign immunity] beyond that which Congress intended,"
United States v. Kubrick, 444 U.S. 111, 118 (1979).  "Neither,
however, should we . . . narrow the waiver that Congress intended."
Id.  In opening the federal courts to tort claims against the
United States, Congress made plain its objective to treat fairly
individuals harmed by the conduct of government actors.  See Feres

-14-

v. <u>United States</u>, 340 U.S. 135, 139 (1950) (describing the FTCA as "the culmination of a long effort to mitigate unjust consequences of sovereign immunity from suit"); <u>id.</u> at 140 ("The primary purpose of the Act was to extend a remedy to those who had been without it . . . ."). Although we are not "free to construe [the FTCA statute of limitations] so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims," <u>Kubrick</u>, 444 U.S. at 117, we also should not make the reasonableness judgment in a particular case without regard for the FTCA's objective "to mitigate unjust consequences," <u>Feres</u>, 340 U.S. at 139.

Here, even without taking into account the egregiousness of the government's conduct, the facts favor the Hallorans and the Donahues. Our earlier precedent had carved out a path that should have led the panel majority to conclude that the Hallorans' and Donahues' suits against the United States were timely. As I shall explain, the circumstances here are readily distinguishable from those of other, related cases in which we have found the plaintiffs' actions to be late. Moreover, when measured against the only just outcome in this case, the majority's rejection of the Halloran and Donahue claims as time-barred is not only wrong, but inexcusably so.

The panel majority concludes that the plaintiffs reasonably should have known the factual basis for their claims by September 2, 1998, based solely on "information that was generally

-15-

available at the time of the Salemme hearings." Donahue, 634 F.3d at 625. The critical information was "the avalanche of publicity" surrounding John Morris's testimony in April 1998, id., supplemented by subsequent publicity about the ongoing hearings, most notably publicity on September 2 surrounding Stephen Flemmi's admission that he had been told of Brian Halloran's tip to the FBI about Roger Wheeler's murder. Undoubtedly, these press reports concerning Morris and Flemmi were a significant development in unwrapping the relationship between the FBI and Bulger/Flemmi. In none of our other cases, however, were these early-stage reports the only basis for attributing knowledge of the relationship to the plaintiffs. Among other factors, we have emphasized Judge Mark L. Wolf's decision in September 1999 – a year after the cutoff date imposed by the majority in this case – as an important piece of the puzzle.

As examples of other approaches to the accrual date, in the Roger Wheeler case (the other plaintiff in McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004)), where the cut-off date for accrual was May 1999, one family member had spoken publicly on 60 Minutes suggesting actual knowledge of a connection between the FBI and Bulger/Flemmi before the cut-off date, and other family members were aware of that broadcast, among other news reports. Id. at 49. In Rakes v. United States, 442 F.3d 7 (1st Cir. 2006), where the cutoff also was in May 1999, the panel referred to the

"speculation" before September 1998 about John Connolly's protection of Bulger and Flemmi, which triggered a duty to inquire. Id. at 23. We then concluded that the claim accrued "by late 1998" after Rakes's own trial and the publication of articles surrounding Flemmi's. Id. (emphasis added). Adopting that same timeline based on the same publicity would save the Hallorans' claim. As for Michael Donahue, whose claim was filed a bit later, it is significant that he was an innocent bystander while Rakes was immersed in the Bulger/Flemmi history as a result of his own trial in late May and June 1998 (for perjury, because he lied to the grand jury about whether Bulger forced him to sell his – Rakes's – liquor store). If "late 1998" was the appropriate accrual date for the Rakes family, it would be appropriate to conclude that the accrual date for the Donahues was months later (arguably as late as Judge Wolf's decision in September 1999). In addition, much of the publicity cited in Rakes referred to the FBI's acquiescence to criminal activity other than murder – which would not have alerted the plaintiffs to the much more outrageous link between the FBI and the killings of their family members. Id. at 22-23.

In Callahan v. United States, 426 F.3d 444 (1st Cir. 2005), where the cutoff date was May 2000, we noted the April 1998 publicity surrounding Morris's testimony but also emphasized newspaper articles that were published in 1999 and Judge Wolf's opinion. The panel wrote: "Agent Morris's testimony and Judge

-17-

Wolf's opinion easily provide the requisite knowledge that the FBI protected Bulger and Flemmi from prosecution and emboldened them to commit crimes, including the murder of Callahan." Id. at 454. Moreover, we said that "Judge Wolf's statement [suggesting that Bulger and Flemmi may have played a role in the Wheeler, Halloran, and Callahan murders] would prompt a reasonable person to further investigate the matter." Id. (emphasis added). By no means did we suggest that the publicity surrounding Morris's testimony more than a year earlier was enough on its own to start the running of the clock. Likewise, in Patterson v. United States, 451 F.3d 268 (1st Cir. 2006), the plaintiffs' claims were rejected "most importantly" because one of the plaintiffs had been interviewed about the FBI's possible role in the murder at issue before the cutoff date – not because of the news accounts. Id. at 273.

It is noteworthy that, in all of these cases, the accrual cutoff date was later than the dates in the present case (September 25, 1998 and March 1999). As more time passed – particularly with the publication of Judge Wolf's opinion in September 1999 – Morris's sensational testimony about the FBI's complicity became more plausible. As Judge Torruella points out in his dissent from the panel majority opinion, there was no good reason in the early stages of the publicity for these particular plaintiffs to pay attention to facially outrageous allegations concerning the FBI's relationship with Bulger and Flemmi. See Donahue, 634 F.3d at 633

-18-

(Torruella, J., dissenting).  Halloran had identified Flynn as his assailant, and the government thought that allegation sufficiently reliable to try Flynn for the crime.  By September 1998, it may have been reasonable to conclude that the plaintiffs here should have had a "'hunch, hint, [or] suspicion'" of a claim, McIntyre, 367 F.3d at 52 (citation omitted), at most imposing a duty of inquiry.  But that inquiry cannot be presumed to have had instantaneous results and, indeed, the government was still unwilling in 2005 to concede that Connolly had disclosed Halloran's conduct to Bulger and Flemmi.  See Donahue, 634 F.3d at 637 (Torruella, J., dissenting).  At a minimum, the claims here should not have been found to accrue, as in Rakes, before "late 1998" and, in light of the unique scenario involving Jimmy Flynn, and Donahue's bystander status, the plaintiffs were entitled to a more generous view of the timing.

I can safely say that no one on our court is happy with the result reached by the panel majority in this case.  All of us recognize the injustice that has been done to the Donahue and Halloran families.  But we could have remedied this injustice.  The en banc process is designed for just this situation, where the flawed application of precedent by a panel majority should be corrected.  I deeply regret that we have failed to do so.  I therefore dissent from the denial of rehearing en banc.

**THOMPSON**, <u>Circuit Judge</u>, **dissenting from the denial of rehearing en banc.** For the reasons so well articulated by my dissenting colleagues, I agree with them that our precedent does not compel the conclusion reached by the majority and that this case -- whose core question, simply put, is at what point should a reasonable person believe that the government is lying to them[6] -- presents an issue of exceptional importance to be considered by the full court. <u>See</u> Fed. R. App. P. 35(a)(2). Accordingly, I readily join my colleagues in dissenting from denial of rehearing en banc. I write separately to profess the following: assuming our precedent does indeed mandate the outrageous conclusion reached by the majority, the grave injustice seething from such a result surely provides more than enough reason for us to reexamine the precedent that currently restrains us. I dissent.

By the Court:
/s/ Margaret Carter, Clerk

cc: Hon. William G. Young, Ms Sarah Thornton, Clerk, United States District Court for the District of Massachusetts, Mr. Meier, Mr. Matthews, Mr. George, Mr. Mazzone, Ms. Lipscomb, Mr. Eiser, Mr. Mullane, Mr. Weigand, Ms. Leach, Mr. Hinchey, Mr. Morris, Mr. Levy, Mr. Schieffelin, Mr. Bondy and Mr. Christie.

Q:\TO_ABBS\wp\09-1950O.01a.wpd

---

[6] This is not a question of sympathy, but rather, American civics.

-20-